Lyman H. Smith, J.
Defendant appeals from his conviction on May 1, 1969, after summary trial in a Court of Special Sessions, Town of Genoa, the Hon. Elliott Welch, Town Justice presiding, of a violation of section 140.05 of the Penal Law (criminal trespass, third degree).
Section 140.05 of the Penal Law provides as follows: “A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises. Criminal trespass in the third degree is a violation.”
The Justice’s return and the trial transcript reveal the following pertinent factual background.
On August 14,1968, at approximately 8:00 p.m., the defendant, Walter Rewald, a newspaper reporter employed by the Citizen Advertiser of Auburn, New York, entered the Kings Perry migrant labor camp located adjacent to New York State Highway 34-B in the Town of Genoa, Cayuga County, and was asked, or ordered to leave the premises. He refused and at the request of the migrant camp manager was arrested by a State Police officer. It is clear from the record that the camp manager had previously (between August 3 and August 14) ordered the defendant from other nearby premises owned by the Cayuga Producers Cooperative, Inc. It is also clear from the record that on the instant occasion the defendant called the camp manager on the telephone prior to his visit, advising him of his intention to visit the migrant camp, with the result that the State Police officer was summoned in time to create under these circumstances a “ test case ” (so-called).
Little would be gained by a recital of the polarization that had developed prior to this incident between the defendant newspaper reporter and the representatives of the corporate owner of the migrant camp. -Suffice it to say, that during the year prior to this particular occasion the relationship between the news media, at least, this particular representative thereof, and the camp management had progressed from one of mutual and welcome co-operation in observing, reporting and dealing with the problems and living conditions of the migrant workers in the camp, to one of restrained but firm hostility. Of more significance are those facts which must serve to illuminate the issue of “ criminal trespass ” here charged, as opposed to the individual’s rights of license and privilege to visit (or trespass) without criminal sanction upon premises owned by another.'
It is undisputed that the Cayuga Producers Cooperative, Inc., owned the land upon which the migrant camp is located, comprising approximately 40. acres. The co-op. has operated the *455 camp as a convenience for migrant farm laborers and, necessarily as an economic adjunct -to the planting, cultivation and harvesting of the corporate owners’ farm crops. In season, the camp population approximates 450 residents of all ages, housed in barracks-type block buildings. Quarters in these buildings are assigned to various groups or crews, each under direction of a crew leader, who individually assigns rooms or space to employees or families within his crew. The crew leader usually establishes a restaurant type of food service, called a “juke”, where individual laborers or visitors pay for their meals, while the families usually cook for themselves. The general manager of the camp testified upon the trial that there is no restriction against members of the public 61 or friends or visitors who are on the camp ” using the juke. He further testified that the juke is a “ major source of their recreation and where the migrants spend their free time ”, The camp is large and busy, including a church, conducting regular church services and in which, at one time, the Office of Economic Opportunity funded the operation of a cafeteria. A grocery store, under proprietorship of a camp resident, a large recreation building, a baseball field, a basketball court, a public washroom and showers, a barber shop, public telephones, an improved roadway or street leading into and through the camp with appropriate street lighting, and a sewage system, have all been constructed and maintained by the corporate owner during the years of its operation. In 1968, there were some 50 automobiles in the camp area owned by the residents, many of whom shopped for groceries and other personal needs in nearby communities. Also, during this particular summer, the New York State Federation of Growers and Processors operated a day-care center in the camp for children of working parents. In previous years the County Health Department had established a health center in a trailer located within the camp staffed by local physicians, public health nurses and volunteer medical personnel from the Upstate Medical Center of Syracuse, New York. The Department of Social Services distributes surplus food in the camp. School buses serve the school-age residents during the school year.
All the foregoing facts point to a definitive picture of the typical 11 company town ’ ’. While it is undisputed that residents, nonresidents, friends, tradesmen, social workers, college students, reporters and politicians contributed to the flow and volume of traffic in and through the camp, nevertheless, the corporate owner insisted upon and at times exercised a dis *456 criminatory private control over the camp area. A large sign greeted visitors at the entrance to the camp which provided as follows: “LABOR CAMP — PRIVATE PROPERTY— Open to Residents — Non-residents Must Register at Office — Violators Will be Prosecuted”. The record reveals conflicting testimony as to whether or not visitors were required to secure ‘ ‘ passes ’ ’. The record also reveals that the defendant-appellant for several years prior to this particular incident enjoyed free ingress and egress without “ registering ”, and without a “ pass ”, apparently with the verbalized permission of the general manager. His testimony describing his attendance at baseball games, picnics, delivery of baseball uniforms, clothing, photographs, and the like, was uncontradicted. Indeed, he testified that on this occasion, among other things, he sought to deliver photographs or pictures which he had promised to camp residents. There was testimony to the effect that the camp management resisted recruiting of workers by competitors and on some occasions required registration of social workers and college students. A candidate for Congress described his difficulties in entering the camp on at least one occasion.
The simple issue upon this appeal is whether or not the proof supports the charge that on this particular occasion and under these specific circumstances the defendant-appellant entered or remained ‘ ‘ unlawfully ’ ’ upon the premises. To put it another way, “ Does the mere fact of private ownership (of premises allegedly open to the public) permit the owner or possessor to deny or revoke the right to enter and to expel the licensee under our penal sanction against “ criminal trespass ”?
Subdivision 5 of section 140.00 of the Penal Law is entitled “ ‘ Enter or Remain Unlawfully ’ ”. In its pertinent provisions it reads as follows: “ A person ‘ enters or remains unlawfully ’ in or upon premises when he is not licensed or privileged to do so. A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorised person ”. (Emphasis supplied.)
Clearly this provision permits entry upon premises “ open to the public” in the absence of a specific prohibition. Query then, when are premises “ open to the public ”, and when, and under what circumstances, may the right to remain be revoked?
That the Kings Ferry migrant labor camp was “ open to the public” seems clear from the present record. The fact *457 that its residents move freely in and out of the area dictates a finding that they, too, are part of the public. So, too, are all those who come and go for various social and business reasons, including the defendant-appellant. We turn then to a consideration of the rights of the owner or possessor of such premises.
This court is compelled to conclude that mere title or possessory control of premises cannot be determinative of the issues met here. In those cases revealing a public or quasi-public use of premises a determination of the right to impose the penal sanction against trespass must depend upon the degree of public use which the owner permits or invites upon his premises. Public or partial public use of premises, whether under express or implied invitation or permission, carries with it the license to enter and, absent abuse of such privilege, carries with it the correlative license to lawfully remain. In cases such as this, the owner’s or possessor’s revocation of the right to remain (by denial, request or by order to leave), which will convert the status of the alleged offender from licensee to that of criminal trespasser, must rest upon, and arise from, either reasonable customs and practices, rules, regulations, and/or statutory law, or under circumstances from which a reasonable owner and possessor would anticipate clear and present danger to person, property or the public peace. But, in no event, under the circumstances we have here, should revocation of the right to remain be predicated upon mere whim, caprice, or arbitrary choice. To permit arbitrary and capricious ejection from publicly used premises would violate not only the fair intendment of the statutory privilege, but would clearly raise serious questions of fundamental constitutional rights.
Upon this appeal defendant-appellant stresses the constitutional rights of freedom of press (U. S. Const., 1st Arndt.) and the constitutional proscriptions against abridgement or denial of privileges and immunities of citizens, due process and the guarantees of equal protection of the laws (U. S. Const., 14th Arndt.). Such constitutional rights come into play where, as here, the migrant camp residents spend much time within the camp area. They have under our Constitution a right to free access to information and, most certainly, visitors, such as news reporters, may not be denied without good cause shown the right of reasonable visitation for purposes of gathering and disseminating news. Thus, camp residents and public alike may be fully informed, may openly communicate their ideas, may intelligently exercise their franchise to vote and, when and if necessary, petition their government for redress of griev *458 anees. (See, Marsh v. Alabama, 326 U. S. 501; National Labor Relations Bd. v. Lake Superior Lbr. Corp., 167 F. 2d 147.) Clearly, in such cases, a sharp distinction arises between private property used solely for the owner’s private purposes, where the owner’s right to protection against criminal trespass and from invasion of his constitutional right to privacy, will take precedence, and premises which are clearly open and dedicated to public uses. In Marsh v. Alabama (supra) the United States Supreme Court overturned the trespass conviction of a Jehovah’s Witness who had attempted to distribute religious tracts in a company-owned town. The Supreme Court held (p. 506): “ Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it ”.
Our courts have consistently held that the right to exercise trespassory sanction may not he invoked where the use of the premises is public or partially public. (See Wolin v. Port of New York Auth., 268 F. Supp. 855; Food Employees v. Logan Plaza, 391 U. S. 308; Thomas v. Collins, 323 U. S. 516.)
Under the circumstances here the court is drawn to the inescapable conclusion that the People have failed to prove any meaningful claim to protection of a right of privacy on the part of the complainant owner, nor has any significant claim been advanced for protection of the normal business operation of the migrant camp. In sum, this court finds that the defendant-appellant did not enter or remain on the complainant’s premises “unlawfully”.
There was no violation of the penal statute.
The appeal is sustained.
An order may he entered dismissing the information, setting aside the judgment of conviction and providing for the remission of the fine.