Donald **FOLGUERAS** et al., Plaintiffs,

v.

Joseph W. **HASSLE** et al., Defendants.

**UNITED STATES** of America,
Plaintiff,

v.

Joseph **HASSLE**, Defendant.

Civ. A. Nos. 252, K–26–71.

United States District Court,
W. D. Michigan, S. D.

Sept. 7, 1971.

Ryan, McQuillan & Vander Ploeg, Thomas R. Fette, of counsel, Tat Parish, St. Joseph, Mich., Lawrence J. Sherman, Washington, D. C., Edward M. Yampolsky, St. Joseph, Mich., Robert Olson, Hartford, Mich., for plaintiffs.

John P. Milanowski, U. S. Atty., Grand Rapids, Mich., J. Jerry Kantor, Dept. of Justice, Washington, D. C., for plaintiff United States.

Hartwig, Crow & Jones, Benton Harbor, Mich., J. D. Hartwig, Benton Harbor, Mich., of counsel, for defendants Hassle.

Luyendyk, Hainer, Karr & Edens, Grand Rapids, Mich., G. Anthony Edens, Grand Rapids, Mich., of counsel, for other defendants.

## OPINION

FOX, Chief Judge.

### FACTS

Plaintiffs Donald Folgueras, Violadelle Valdez, George Gutierrez and Alicia Gutierrez brought Civil Action No. 252 to recover damages for the denial of equal protection and the deprivation of their privileges and immunities of citizenship under color of law. 42 U.S.C. § 1983. The plaintiffs likewise allege a conspiracy to deprive them of equal protection of the laws under 42 U.S.C. § 1985. Finally, the plaintiffs seek a declaratory judgment upholding their "constitutional, statutory, and common law right," to access to migrant labor camps on the defendant's property.

The plaintiffs in Folgueras, et al. v. Hassle, et al., moved for a partial summary judgment, requesting the court to declare the law relative to access rights to migrant workers labor camps. F.R. C.P., Rule 56. On June 30, 1971, this court issued an interim opinion in response to plaintiffs' motion indicating that a final opinion would be forthcoming. This is the court's final declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

The plaintiff, United States, in United States v. Hassle, K–26–71 C.A., brought its action to enjoin the defendant from denying access to his labor camps to persons seeking to "inform migrant workers and their families about programs of assistance or to help them obtain benefits under the programs." The plaintiff sought, also, to enjoin the defendant from preventing entrance to persons invited onto the property by the migrants and others seeking to enter on reasonable terms and conditions.

The parties to United States v. Hassle were able to agree to a consent decree. A consent decree, when signed by the court, is a judicial act and possesses the same force and character as a judgment rendered following a contested trial. Siebring v. Hansen, 346 F.2d 474 (8th Cir. 1965), cert. denied 382 U.S. 943, 86 S.Ct. 400, 15 L.Ed.2d 352; Kiwi Coders Corp. v. Acro Tool and Die Works, 250 F.2d 562 (7th Cir. 1957); United States by Clark v. Gramer, 418 F.2d 692 (5th Cir. 1969). This court signed the consent decree making it its judgment. This opinion states the court's reasons for doing so.

These two cases present similar legal questions concerning the right of access to migrant labor camps located on the private property of an individual land owner. Because of this similarity this opinion covers both cases.

The facts of Donald Folgueras, et al. v. Joseph Hassle, et al., Civil Action No. 252, are undisputed. The defendant in both cases, Joseph Hassle, owns and operates fifteen agriculture labor camps

in Western Michigan. These camps contain approximately 220 dwelling units, each 12 x 12 feet in dimension, and all used to house migratory workers employed by the defendant Hassle. All of these dwelling units are subject to licensing and inspection under state law.

The incidents giving rise to Donald Folgueras v. Joseph Hassle, took place in one such labor camp called the "Krohn Camp." The "Krohn Camp" may be characterized as a medium size labor camp consisting of some 35 wooden cabins nestled in dense foliage and bordered by a swamp. The camp is hidden from public view and accessible by a single private road leading to the cabins.

The Hassles provide numerous services to the residents of their labor camps, including: water, privies, sanitation, pickups, sewage and shower facilities, medical kits and fire extinguishers.

Nicholas Garza acted as a crew chief for the Hassle farm. His responsibilities included transportation of the crew to and from the fields, to health clinics and hospitals, and to town on the weekends. For most people in the camp, Garza, and those persons authorized to operate his buses and trucks, were the only means of transportation other than by foot. Garza's responsibilities included, also, the duty to maintain order in the camp.

Mr. Hassle, however, maintained close personal control over his labor camps and visited them almost daily. At times he visited the camps several times a day.

The Gutierrez family worked on the Hassle farm and lived in one of the cabins in the "Krohn Camp." The Gutierrezes were in especially bad financial condition upon their arrival at the Hassle farm. Garza provided the family's transportation to Michigan and apparently advanced living expenses as well. Garza therefore deducted these debts from the family's early wages. The Gutierrezes were unable to obtain food stamps after their arrival in Michigan because the Hassles refused to sign the necessary forms. Thus, the Gutierrezes turned to United Migrants for Opportunity, Inc. (UMOI) for emergency food assistance.

UMOI employed Folgueras and Valdez as "student coordinators" during the summer of 1969. Their duties with UMOI included providing social services to residents of agricultural labor camps and gathering research information relating to working conditions and living conditions in migrant camps.

The summer of 1969 brought numerous complaints to the Hassles concerning minimum wage payments and a legal action arising from injury to a crew worker. Crew leaders reported to the Hassles that visitors were responsible for the discontent in the camps and Mr. Hassle responded by directing the crew leaders to have visitors arrested for trespass.

On July 22, 1969, Joseph Hassle forcibly evicted plaintiff Folgueras from the "Krohn Camp" for taking a water sample.

On July 23, 1969, Violadelle Valdez went to the "Krohn Camp" at the invitation of plaintiff Gutierrez. Her purpose was to assist the Gutierrezes with their sick children; Folgueras accompanied her on this visit.

Defendant Hassle observed Valdez and Folgueras driving to the camp and arrived at the camp shortly after them. Hassle immediately attacked Folgueras, knocking him to the ground at least twice and kicking him while he searched on the ground for his glasses. Hassle kept Folgueras pinned on the ground for approximately two hours with a shotgun that may, or may not, have been loaded. This occurred in front of numerous witnesses.

At this point Mrs. Hassle called her babysitter who in turn called the sheriff's office. Two deputy sheriffs, Johnson and Pullen, arrived at the camp and conducted an investigation. The deputy sheriffs conferred with the Hassles and Valdez and Folgueras, but never with the Gutierrez family. After giving Valdez and Folgueras the opportunity to leave, the deputy sheriffs arrested them for criminal trespass.

The plaintiffs in this action seek a declaratory judgment of their right to access to migrant camps. They further seek compensatory damages for defendant Hassle's physical attack on Folgueras and his threats to both Folgueras and Valdez, and for the denial of access itself. The plaintiffs also seek punitive damages for defendant's conduct.

The United States brought United States v. Hassle, K–26–71 C.A., to enjoin the defendant from barring access to his labor camps to representatives of federal, state, local and private assistance programs. The State of Michigan later joined as plaintiff in this request. UMOI later intervened as amicus curiae.

Pursuant to Acts of Congress the United States has established programs designed to assist migrant farm workers. Title III–B of the Economic Opportunity Act of 1964 (42 U.S.C. §§ 2861–2862) provides for financial assistance to state, local and private agencies designed to improve the living conditions and skills of the migrant farm laborer. Specifically the act provides:

*Congressional statement of purpose*

The purpose of this part is to assist migrant and seasonal farmworkers and their families to improve their living conditions and develop skills necessary for a productive and self-sufficient life in an increasingly complex and technological society. [42 U.S.C. § 2861]

*Financial Assistance*

(a) The Director may provide financial assistance to assist State and local agencies, private nonprofit institutions and cooperatives in developing and carrying out programs to fulfill the purpose of this part.

(b) Programs assisted under this part may include projects or activities—

(1) to meet the immediate needs of migrant and seasonal farmworkers and their families, such as day care for children, education, health services, improved housing and sanitation (including the provision and maintenance of emergency and temporary housing and sanitation facilities), legal advice and representation, and consumer training and counseling;

(2) to promote increased community acceptance of migrant and seasonal farmworkers and their families; and

(3) to equip unskilled migrant and seasonal farmworkers and members of their families as appropriate through education and training to meet the changing demands in agricultural employment brought about by technological advancement and to take advantage of opportunities available to improve their well-being and self-sufficiency by gaining regular or permanent employment or by participating in available Government training programs.

[42 U.S.C. § 2862]

Title II of the Economic Opportunity Act of 1964 (42 U.S.C. § 2809) establishes programs intended to meet the critical needs of the poor. The Act provides for financial assistance to public and private nonprofit agencies initiated under the Act's programs. In part the Act provides:

A program to be known as "Project Headstart" focused upon children who have not reached the age of compulsory school attendance which (A) will provide such comprehensive health, nutritional, education, social, and other services as the Director finds will aid the children to attain their full potential, and (B) will provide for direct participation of the parents of such children in the development, conduct, and overall program direction at the local level. * * * [42 U.S.C. § 2809(a) (1)]

A program to be known as "Emergency Food and Medical Services" designed to provide on an emergency basis, directly or by delegation of au-

thority pursuant to the provisions of subchapter VI of this chapter, financial assistance for the provision of such medical supplies and services, nutritional foodstuffs, and related services, as may be necessary to counteract conditions of starvation or malnutrition among the poor. [42 U.S.C. § 2809(a) (5)]

Title I of the Elementary and Secondary Education Act of 1965 (20 U.S.C. §§ 241a, 241c(a) (6), and 241e(c)) provides for assistance to schools that conduct special educational programs for migrants' children, as follows:

In recognition of the special educational needs of children of low-income families and the impact that concentrations of low-income families have on the ability of local educational agencies to support adequate educational programs, the Congress hereby declares it to be the policy of the United States to provide financial assistance (as set forth in the following parts of this subchapter) to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means (including preschool programs) which contribute particularly to meeting the special educational needs of educationally deprived children. [20 U.S.C. § 241a]

"A State educational agency or a combination of such agencies may apply for a grant for any fiscal year under this subchapter to establish or improve, either directly or through local educational agencies, programs of education for migratory children or migratory agricultural workers," where the funds will be used for programs and projects designed to meet the special educational needs of migratory children or migratory agricultural workers. [20 U.S.C. § 241e (c) (1)].

The facts of United States v. Hassle reveal several instances of denial of access to representatives of various public and private agencies concerned with assistance to migrant farm workers.

United Migrants for Opportunity, Inc. (UMOI) is a private nonprofit corporation funded under the Economic Opportunity Act of 1964. UMOI provides many services for migrant laborers, including: legal aid, an emergency food program, assistance in obtaining food stamps, and a "Mobile Headstart" program that moves north with the migrant stream as the year progresses.

On July 8, 1970, John Bowers, an employee of UMOI, visited "Stienke Camp" at the invitation of one of the camp's residents. Joseph Hassle cut this visit short by violently attacking Bowers, threatening his life, and smashing all the windows of Bowers' car with a lead pipe.

Services for Migrant Farmworkers (SMF) is a church-affiliated organization with purposes similar to those of UMOI. Joseph Hassle has consistently refused to permit representatives of SMF to visit his labor camps even to provide spiritual and religious activities.

During 1970 Sister Betty La Budie worked for the Berrien County Health Department in its "migrant health clinic." Her job entailed, among other things, providing transportation to the clinic, hospital, and other places if necessary. During the summer of 1970 Sister La Budie sought access to a Hassle camp to inform one of Hassle's workers that his son had been admitted to the hospital as an emergency case and that as a result of this his wife had suffered a miscarriage. Joseph Hassle prevented her from going onto the camp by threatening dire consequences to her and the migrants if he found her at one of the camps.

In the summer of 1970 Juan Amando Sauceda was employed by the Dowagiac School District recruiting children for migrant summer school. The United States Department of Health, Education and Welfare funded the school. Sauceda, and the program he represented, were prevented from reaching the Hassle camps—again through acts of physical violence or threats thereof.

Few would contest at this late date, that the vast majority of America's migratory farm workers live in abject poverty. The average migrant family earns slightly in excess of $3,000 per year as a family unit.[1] Of this amount, the head of the household earns approximately $2,800.[2]

Normally the grower will arrange with a crew leader to provide a crew of laborers at a specified time and wage. The crew leader in turn arranges with the workers for their work at the farm. Leaving it to the crew leaders to gather necessary manpower more or less naturally leaves the workers with very little bargaining power against the grower. The crew leader, who makes the agreement with the grower, has little incentive to demand higher rates for the workers. In fact, the lower the rate the crew leader will accept the more desirable he becomes to the grower. Thus, the accepted system of employment thrusts against any real improvement in the migrant's wages.

Much has been written and said about the living conditions of the migrant laborer. Necessity usually requires migrants to stay in overcrowded inadequate housing. The facilities accompanying the housing may be unsanitary and in ill-repair.

Migrant children bear the consequences of their parent's ephemeral work and general poverty. The constant movement within the migrant stream results in great educational hardship. Much time is lost between schools and each move precipitates necessary adjustment to new teachers, classmates and texts.[3] Furthermore, education is one of the most important needs of the migrant farm worker. Advancing agricultural mechanization steadily reduces the necessity for migrant farm labor. In fact, the need for migrant labor may totally evaporate within twenty years. Thus, today's migrant children may become tomorrow's unemployables unless they receive the educational assets needed to break out of the migrant stream.

The migrant laborer's education problem is symptomatic of his larger problem—isolation. Language, color, and culture isolate the migrant from the community where he works. Migrants live in labor camps, often miles from the nearest town; usually they do without private transportation. This severely limits access to nearby towns. Long working hours and money likewise limit the ability to leave camp.

The most significant isolation, however, stems from the migrant's transcience itself. Migrant farm workers "arrive, work and [depart] in isolation from the life of various communities whose fields they infiltrate and work." [4] They are never part of the communities where they work and because of this the communities rarely treat the migrant's problems as their own. Thus, the migrant can expect little from surrounding communities.

Out of all that has been set forth above, two things stand out. First, Joseph Hassle did deny access to labor camps located on his property to representatives of organizations designed to aid the migrant laborer. Second, access to migrant labor camps is critically important to helping the migrant out of his poverty and isolation.

## THE RIGHT TO ACCESS

The controversy surrounding the right of access to migrant labor camps involves the rights of three different interests: the grower, the visitor, and the migrant.

1. Subcomm. on Migratory Labor of the Senate Comm. on Labor and Public Welfare, The Migratory Farm Labor Problem in the United States, S.Rep.No.71, 90th Cong., 1st Sess. at 2 (1967) [hereinafter cited as Senate Report]. See Migrant Farm Labor in Upstate New York. 4 Col.Jour. of Law and Soc.Prob. 1, 14 (1968).

2. Senate Report, supra note 1, at 2.

3. Migrant Farm Labor in Upstate New York, supra note 1, at 42.

4. Subcommittee Report of the Committee on Labor and Public Welfare on Migratory Labor, The Migratory Farm Labor Problem in the United States, 90th Cong., 2d Sess., as extended, 12-18 (1969).

In these cases the grower asserts his rights as a property owner. Joseph and Harriet Hassle acted on the premise that, as the owners of their farm, they could exclude *any* person from access to their labor camps. The migrants, on the other hand, assert their constitutional rights of freedom of speech, religion and association, and their rights as tenants. They feel these rights secure them from the property owner's censorship of their information and associations. Likewise, those seeking access to migrant labor camps assert that their constitutional rights prevent the owner from barring access to his camps.

Thus, these cases present the substantive issue of whether, considering the rights of all the parties involved, the private owner of migrant labor camps may lawfully bar access to visitors or representatives of assistance groups seeking admittance to the camp. This court holds that he may not.

## CONSTITUTIONAL RIGHTS

In April of 1971 the Michigan Attorney General filed an opinion in answer to the following question:

"May representatives of public and private organizations enter and remain upon the premises of an agricultural labor camp for the purpose of visiting migrant agricultural workers dwelling thereon without violating the state criminal trespass statute?" Opinion of the Attorney General #4727, filed April 13, 1971.

In answer to this question the Attorney General stated:

"The owner or operator of a migrant agricultural labor camp by permitting occupation and movement of migrant agricultural workers and their families on the premises of the agricultural labor camp has thereby made the use of the agricultural labor camp premises, including ingress and egress therefrom, public. The freedoms of religion, speech, press and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution are operative throughout the length and breadth of the land. They do not become suspended on the threshold of an agricultural labor camp. The camp is not a private island or an enclave existing without the full breath and vitality of federal constitutional and statutory protection." Attorney General Opinion #4727, at 12.

The First Amendment to the Constitution protects the freedoms of speech, association and religion from state action. The state may not act so as to impede these constitutionally secured rights. The question here is whether the enforcement of the Michigan criminal trespass statute, M.C.L.A. 750.552; M.S.A. 28.-820(1), against visitors to migrant labor camps constitutes such unconstitutional state action. The answer to this question depends upon the nature and use of the property involved.

The controlling case in this area is Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In Marsh, the court found the constitutional guarantees of freedom of speech and religion precluded enforcement of a state trespass statute against one who distributed religious literature on the street of a company-owned town. In reaching this conclusion, Mr. Justice Black said:

"Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, *the more do his rights become circumscribed by the statutory and constitutional rights of those who use it * * *.*" 326 U.S. at 506, 66 S.Ct. at 278.

And later:

"Many people in the United States live in company-owned towns. *These people, just as residents of municipalities, are free citizens of their State and country.* Just as all other citizens they must make decisions which affect the welfare of the community and nation. *To act as good citizens they must be informed.* In order to enable them

to be properly informed their information must be uncensored. *There is no more reason for depriving these people of the liberties guaranteed by the First and Fourteenth Amendments than there is for curtailing these freedoms with respect to any other citizen."* 326 U.S. at 508–509, 66 S.Ct. at 279–280. (Emphasis supplied.)

In concluding that the owner's property interests did not settle the question, the court recognized that the property involved, although owned by a private owner, had really lost its "private" quality. The petitioner in Marsh was arrested while passing out religious literature in the business district of a company town. The owner of the company town could not assert the interest of a private home owner, for example, because it had opened up its property for use by the public. Its rights were therefore limited by the rights of those using the property. The business and shopping district of a company town is so open to the public that a trespass statute cannot constitutionally be enforced against a member of the public exercising his constitutional rights there.

The Marsh case was later followed in Amalgamated Food Employees Union, Local 590 et al. v. Logan Valley Plaza, Inc. et al., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). In Logan Valley, the Supreme Court held that the First Amendment protected picketing upon the private premises of a shopping center to which the public had access. Here the court stated:

> The sole justification offered for the substantial interference with the effectiveness of petitioners' exercise of their First Amendment rights to promulgate their views through handbilling and picketing is respondents' claimed absolute right under state law to prohibit any use of their property by others without their consent. However, unlike a situation involving a person's home, no meaningful claim to protection of a right of privacy can be advanced by respondents here. Nor on the facts of the case can any significant claim to protection of the normal business operation of the property be raised. Naked title is essentially all that is at issue. 391 U.S. at 324, 88 S.Ct. at 1611, 20 L.Ed.2d at 615.

Because the private shopping center in Logan Valley, like the business street in Marsh, was open to the public, the state criminal trespass statute could not constitutionally be enforced against union picketers peacefully picketing on shopping center property.

Marsh's principle that "the more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it," has been applied in cases very similar to those presently before the court.

In N.L.R.B. v. Lake Superior Lumber Corp., 167 F.2d 147 (6th Cir. 1948), the court held that the defendant owner of camps housing lumber employees could not lawfully prevent access to its lumber camps to union representatives. The court relied on Marsh in stating:

> "The Act [Wagner Act] included the right of the employees to freely discuss and be informed concerning their collective bargaining rights, and the correlative right of the union to discuss with and inform them concerning the matters involved." 167 F.2d at 151.

The court in Lake Superior Lumber Corp. recognized that the employer's private property interests could not cut off the statutory rights of those living on its property. The plaintiffs in the cases presently before this court assert both statutory and constitutional rights. Folgueras and Valdez, plaintiffs in Folgueras v. Hassle, were employees of an organization funded under Title III–B of the Economic Opportunity Act of 1964, supra. Migrant laborers are entitled to the benefits afforded them under this Act. Likewise, migrant laborers are entitled to the benefits of those state and federal programs excluded from Hassle's labor camps in United States v. Hassle.

Both the Marsh case and the Lake Superior Lumber Corp. case were relied on by the court in People v. Rewald, 65 Misc.2d 453, 318 N.Y.S.2d 40 (1971). In the Rewald case the court held that the New York State criminal trespass statute could not be enforced against a newspaper reporter visiting a migrant labor camp. Thus the court stated:

> "They [the migrants] have under our Constitution a right to free access to information and, most certainly, visitors, such as news reporters, may not be denied without good cause shown the right of reasonable visitation for purposes of gathering and disseminating news. Thus, camp residents and public alike may be fully informed, may openly communicate their ideas, may intelligently exercise their franchise to vote and, when and if necessary, petition their government for redress of grievances. (See, Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, 1946; National Labor Relations Board v. Lake Superior Lumber Corp., 167 F.2d 147, 6 Cir., 1948.) Clearly, in such cases, a sharp distinction arises between private property used solely for the owner's private purposes, where the owner's right to protection against criminal trespass and from invasion of his constitutional right to privacy, will take precedence, and premises which are clearly open and dedicated to public uses." 318 N.Y.S.2d, at 45.

The sum total of the cases applying Marsh compel the holding that the owner of these migrant labor camps, Hassle, may not constitutionally deprive the migrant laborers living in his camps, or members of assistance organizations, or mere visitors of reasonable access to his camps. True—the migrant labor camps in question are not exactly like the business district of the company owned town in Marsh or the shopping center in Logan Valley. But the principle applied in these two cases, as in the Lake Superior Lumber Corp. case and People v. Rewald, is identical. Joseph Hassle opened up portions of his property as the living areas for those working on his farm. The camps are not located near his home but are placed in fifteen different locations near the fields where the migrants work. As in Logan Valley, Hassle cannot reasonably claim an invasion of his privacy by those seeking to visit his labor camps. Nor can ownership alone give him the right to censor the associations, information and friendships of the migrants living in his camps. His rights of ownership of the land in question must bend to the countervailing rights of those persons rightfully living on his land.

## PROPERTY RIGHTS

During the pretrial conferences in Folgueras v. Hassle, and during the hearing in United States v. Hassle, this court voiced its determination that New Jersey v. Shack, 58 N.J. 297, 277 A.2d 369 (1971), was the law in Michigan.

In the Shack case a field worker of an OEO funded organization and a staff attorney of the Farm Workers Division of Camden Regional Legal Services, Inc., were convicted of criminal trespass after refusing to leave a privately owned migrant labor camp. The New Jersey Supreme Court declined to rest its decision on constitutional grounds. In the words of the court, "The reason is that we are satisfied that under our State law the ownership of real property does not include the right to bar access to governmental services available to migrant workers and hence there was no trespass within the meaning of the penal statute." 277 A.2d at 371–372. As a matter of property law, the ownership of a labor camp does not entail the right to cut off the fundamental rights of those who live in the camp.

> "The quest is for a fair adjustment of the competing needs of the parties, in the light of the realities of the relationship between the migrant worker and the operator of the housing facility.
>
> "Thus approaching the case, we find it unthinkable that the farmer-employer can assert a right to isolate the migrant worker in any respect signifi-

cant for the worker's well-being. The farmer, of course, is entitled to pursue his farming activities without interference, and this defendants readily concede. But we see no ligitimate need for a right in the farmer to deny the worker the opportunity for aid available from federal, State, or local services, or from recognized charitable groups seeking to assist him. Hence representatives of these agencies and organizations may enter upon the premises to seek out the worker at his living quarters. So, too, the migrant worker must be allowed to receive visitors there of of his own choice, so long as there is no behavior hurtful to others, and members of the press may not be denied reasonable access to workers who do not object to seeing them." 277 A.2d, at 374.

Property rights are not absolute. As articulated by the New Jersey Supreme Court, the common law maxim *"Sic Utere Two ut Alienum Non Laedas"* expresses "the inevitable proposition that rights are relative and there must be an accommodation when they meet. Hence it has long been true that necessity, private or public, may justify entry upon the lands of another." 277 A.2d at 369.

The factors that led the New Jersey Court to conclude that access to migrant labor camps is a necessity are those factors discussed above—isolation, communication, and poverty. "[T]he employer may not deny the worker his privacy or interfere with his opportunity to live with dignity and to enjoy associations customary among our citizens. These rights are too fundamental to be denied on the basis of an interest in real property and too fragile to be left to the unequal bargaining strength of the parties. Seen Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 403–404, 161 A.2d 69 (1960)." 277 A.2d, at 374–375.

Migrant laborers in Michigan are no less in need than migrants in New Jersey. This court concurs with the New Jersey court in concluding that the property rights of the camp owner do not include the right to deny access to his camps to guests or persons working for any governmental or private agency whose primary objective is the health, welfare or dignity of the migrant workers as human beings.

## TENANCY

■ The migrants living in Joseph Hassle's labor camps are tenants within the meaning of Michigan law. Their tenancy entitles them, their guests, and representatives of assistance organizations to full rights of ingress and egress to and from their dwellings.

It is commonly understood that a portion of the migrant's compensation for his work is his housing. The "Clearance Order" by which the grower secures his labor force states that housing is provided and that "rent is free." The crew leader then uses the rent-free aspect to muster up the necessary crew, and the "free rent" dwellings are one justification for the low wage paid migrant laborers. The migrant, therefore, pays the grower for the housing provided. New Jersey v. Shack, supra.

The clearance order also requires the housing provided to meet specified minimum standards. These requirements are found at 20 CFR §§ 620.1–620.17

Once the migrant reaches the camp he takes exclusive possession of the dwelling so long as he works for the grower. In Folgueras v. Hassle, Garza specifically told his crew this and *Hassle* said it was true in his deposition.

Thus, all the elements of the typical landlord-tenant relationship are present. The migrant pays for the dwelling he occupies; the landlord binds himself to provide a dwelling of a fixed quality; the migrant occupies the dwelling exclusive of the landlord for an agreed upon term—the length of his employment.

As tenants, the migrants are vested with the full rights of tenancy.

"When duly created and the tenant put in possession, he is owner of an estate for the time being, and has all the usual rights and remedies of an owner

to defend his possession." Morrill v. Mackman, 24 Mich. 279 (1872).

And later the Michigan Supreme Court further stated:

"There goes with every rental of premises the right of beneficial enjoyment by the tenant for the purpose for which the premises are rented, at least to the extent disclosed to the lessor at the making of the lease. Such enjoyment the landlord may not destroy or seriously interfere with, in use by himself or permitted use by others, of any part of the premises occupied in conjunction therewith." Grinnell Bros. v. Asiuliewicz, 241 Mich. 186, at 188, 216 N.W. 388 (1927).

One of the rights of tenancy with which the landlord may not interfere is the right to invite and associate with guests of the tenant's own choosing. Lott v. State, 159 Miss. 484, 132 So. 336 (1931); Brown v. Kisner, 192 Miss. 746, 6 So.2d 611, 617 (1942); Denver v. Sharpless, 191 Pa.Super. 554, 159 A.2d 7 (1960).

## CONCLUSION

Whether the court regards the question of access to migrant labor camps as one of constitutional law, the rights surrounding the ownership of real property or the rights of tenants in relation to their landlord, the law compels a single conclusion. The fundamental underlying principle is simply that real property ownership does not vest the owner with dominion over the lives of those people living on his property.

The migrants who travel across the country to work in the grower's fields and live on the grower's property are clothed with their full bundle of rights as citizens and human beings. They may not be held in servitude or peonage, and they are not serfs.

They are, however, citizens of the United States and tenants. As such they are entitled to the kinds of communications, associations, and friendships guaranteed to all citizens, and secured by the Constitution. The owner's property rights do not divest the migrants of these rights.

Plaintiffs' motion for partial summary judgment is therefore granted. The fact that the denial of access entails the denial of constitutional rights entitles the plaintiffs to bring their action under 42 U.S.C. §§ 1983 and 1985. See Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

The above declaratory judgment of the right of access is consistent with the court's expression of the law in United States v. Hassle. Pursuant to this conception of the law the parties agreed to the following consent decree:

It is hereby ordered that Joseph Hassle is enjoined from threatening, interfering with, or attacking representatives of the United States government, the State of Michigan, or any private non-profit agency or organization which promotes the health, education, job training or general welfare of migrant workers and their families.

The defendant is further enjoined from interfering with the representatives of such organizations who seek to enter or have entered, agricultural labor camps which are located on land which he owns or controls when occupied by residents.

The defendant is further enjoined from interfering with any persons who seek access to enter agricultural labor camps or have entered said camps located on property he owns or controls for the purpose of visiting the residents of said camps, or interfering with any constitutional or statutory rights of agricultural workers living in said camps or constitutional and statutory rights of persons visiting the agricultural farmworkers and their families in said camps. Access to said camps will be over roads and normal avenues of travel to said camps.

Individuals entering camps pursuant hereto shall not engage in any conduct which violates the laws of the State of Michigan or the United States or the constitutional or other rights of the defendant.

The foregoing injunction is binding upon the parties to the action, their officers, agents, servants, employees, and attorneys or any person in active concert or participation with them who receive actual notice of the order by personal service or otherwise, as provided in Rule 65(d), Federal Rules of Civil Procedure.