**Rev. Wilfredo VELEZ, Sr., et al.**

**v.**

**Anthony AMENTA, Individually and as Executive Director of the Shade Tobacco Growers Agricultural Association, Inc., et al.**

**Civ. No. H–117.**

United States District Court,
D. Connecticut.

Feb. 15, 1974.

David M. Sheehan, Leverett, Mass., Mitchell W. Pearlman, West Hartford, Conn., for plaintiffs.

Aaron Nassau, Walter Marcus, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

At its inception this case involved many more significant and troublesome legal and factual issues than were presented at the time of trial. In the interim the Court issued a series of temporary orders to forestall a renewal of physical confrontations among the parties and to establish guidelines for a "truce" until the matter was fully heard on the merits. For several months the parties conscientiously abided by the standards promulgated by the Court. This has had the effect of not only maintaining the peace but also of limiting the questions posed for ultimate resolution by the Court, as more fully set forth hereinafter.

## I. FINDINGS OF FACT

1. The plaintiff, Rev. Wilfredo Velez, is the Director of the Ministerio Ecumenico de Trabajadores Agricolas, Inc., a/k/a Ecumenical Farm Workers Ministry, Inc. (hereinafter "META"), a Connecticut corporation organized to provide supportive services to migrant and seasonal farm workers in New England; the plaintiff, Sister Betsy Flynn, is a volunteer teacher for META; and the plaintiff, Juan Irizarry Valentin, is a labor organizer for META and the interim president of the Association of Agricultural Workers of Puerto Rico (hereinafter "ATA"), a farm workers' unincorporated labor union. They instituted this action on behalf of themselves and "all other organizations that provide supportive services to migrant farm workers at Camp Windsor."

2. The plaintiffs, Adaberto Gomez, Hector Marcana, Braulio Medero, Alfonso Rios, Cruz Soler Crespo, and Luis Felipe Soler, are citizens of the Commonwealth of Puerto Rico and migrant farm workers at Camp Windsor. They commenced this case on behalf of themselves and "all farm workers residing at Camp Windsor."

3. The defendant, The Shade Tobacco Growers Agricultural Association, Inc. (hereinafter "Association"), is a nonprofit Connecticut corporation composed of several independent growers of shade-grown tobacco; the defendant, Anthony Amenta, is the Executive Director of the Association; and the defendant, Edward Talbot, is the Manager of Camp Windsor.

4. Each year the Association provides thousands of farm workers for employment in the tobacco fields of its members. These workers include many who are recruited in Puerto Rico pursuant to the provisions of the Wagner-Peyser Act of 1933, as amended, 29 U.S.C. § 49 et seq. The procedure for the recruitment is fully described in 27 Puerto Rican Migrant Farm Workers v. Shade Tobacco Growers Agricultural Association, Inc., 352 F.Supp. 986 (D.Conn.1973).

5. However, for our purposes here, it is sufficient to note that the contract covering the employment of Puerto Rican workers is negotiated annually (usually for the term of employment between the months of April through October) between the Association, acting on behalf of its grower members, and the Secretary of Labor of Puerto Rico, representing the interests of the migrant workers. The workers themselves have, to date, no official voice in the negotiations. The statutes of Puerto Rico require that the agreement be in writing, signed by the Association and each worker, and approved by the Secretary of Labor. The worker is given a copy of the contract before he boards the plane to the United States. In addition, the Migration Division of the Department of Labor of Puerto Rico maintains a central office in Hartford, manned by a full-time official who acts as a representative of the Secretary of Labor of Puerto Rico with respect to all matters pertaining to migrant workers at Camp Windsor. Each worker has the telephone number of the Hartford office.

6. All workers are processed at Camp Windsor for assignment to the particular grower for whom they will be employed. The workers are considered the employees of the growers who pay all their wages in addition to a fee to the Association for services rendered. One-third of the workers, approximately 650, reside at Camp Windsor; the remaining workers are housed and fed at camps owned by members of the Association.

7. Camp Windsor, which was personally inspected by the Court, is located on River Street in the Town of Windsor, Connecticut, approximately eight miles from the City of Hartford. Its seven acres are well landscaped and consist of eight buildings designated as dormitories or barracks, paved streets with ample lighting, a dining hall, a chapel, a recreation hall and canteen, a general store, a well-equipped hospital staffed by nurses and doctors, administrative offices, an outdoor wooden pavilion, playing fields, parking areas, and various service buildings. Public telephones and laundry facilities are available; water and electricity are provided by the Metropolitan District; and sewage disposal is by septic tanks.

8. The Camp is enclosed by a chain link fence except for the entranceway which has no physical barrier. Posted signs indicating "No Trespassing" and "Private Property" are evident. A small building, near the entrance, is used during certain hours by a watchman, a security officer, or at times a uniformed police officer of the Town of Windsor retained by the Association. In addition, the Association contributes toward the cost of a police cruiser patrol in the nearby public street areas during the summer months.

9. On typical working days, from Mondays through Fridays, the worker rises at 5:00 A.M., has breakfast at 5:45 A.M., leaves Camp Windsor by bus for the tobacco fields at 6:30 A.M., commences work at 7:00 A.M., has lunch at 11:30 A.M., completes work at 3:30 P.M., and arrives back at the Camp at 4:00 P.M. Following dinner, the worker usually writes letters, does his laundry, spends time in the recreation hall, and is asleep by 10:00 P.M.

10. Weekends are spent at leisure: watching television, writing, playing cards, receiving visitors, traveling to Hartford or Springfield, Massachusetts, attending religious services, and so forth.

11. The workers are paid $1.90 an hour for their labor and, in turn, pay the Association $17.50 per week for their room and board.

12. The workers are free to visit among themselves and to enter and leave the Camp whenever they wish.

13. Visitors from outside the Camp are required to identify themselves at the entranceway; no visitors are permitted after 9:00 P.M.; female visitors are not permitted in the dormitories. All decisions as to visiting privileges are made solely by the Association. As a general rule, most visitors prior to July 18, 1973

were permitted access to the Camp except known gamblers, prostitutes and "troublemakers."

14. On or about April 12, 1973, about 30 of the workers in concert with representatives of META staged a demonstration at the Camp protesting the quality of the food. The plaintiff Velez and other members of META were permitted access to the workers but with certain restrictions which, in the opinion of the officials of the Association, were necessary to prevent "unrest and violence." For example, plaintiff Sister Betsy was allowed to conduct English classes in the chapel, but was prohibited from discussing "labor matters" or distributing "META material."

15. During the months of May and June, META representatives gained entrance to the Camp during certain hours, 4:00 P.M. to 6:00 P.M., but could not meet with more than 25 workers at one time nor place posters within the Camp. Literature distributed by META attacked the workers' living and working conditions and urged a work stoppage.

16. The defendants were obviously displeased with certain of the activities of the META people and were determined to avoid a workers' strike and in-camp demonstrations.

17. On July 18, 1973, plaintiffs Velez and Irizarry entered the Camp at 2:00 P.M. and commenced to talk with some workers who had just arrived from Puerto Rico. Defendant Talbot, believing the plaintiffs were attempting to interfere with the processing procedures, ordered the plaintiffs to leave the Camp. A scuffle ensued; police were summoned; and the plaintiffs were arrested for criminal trespass under Conn.Gen. Stat. § 53a–107.

18. Thereafter the Association decided to bar plaintiffs Velez, Irizarry and Sister Betsy from the Camp.

19. The following day a news commentator from a local television station was denied access to the Camp.

20. The festering difficulties among the parties culminated in a large demonstration with wide news coverage at the Camp on July 22. The participants included some of the workers, members of META, gospel singers, and representatives from various church groups. Before it concluded, there was a spontaneous counter-demonstration by workers in the Camp who threw water, milk and containers at the other demonstrators. The Mayor of Hartford and several newsmen were unable to enter the Camp, but later that evening were admitted to discuss the situation with the officials of the Association.

21. Following the demonstration, and until August 7, all META personnel were excluded from the Camp.

22. On July 26, this suit was instituted, and, on July 27, Judge T. Emmet Clarie denied the plaintiffs a temporary restraining order. The matter was then assigned to this Court for a hearing on August 7 on plaintiffs' application for a temporary injunction.

23. On August 7, the Court heard offers of proof from counsel for the parties and then, without taking testimonial evidence, met with the attorneys in chambers.

24. As a result, counsel and the parties agreed to comply with the following orders of the Court until the case could be heard on the merits in the fall:

a) Unrestricted visiting will be permitted at the Camp between 9:00 A.M. and 10:00 P.M. daily. After 9:00 P.M. visitors must leave the barrack areas if one or more workers wish to sleep.

b) META personnel will have free access to the Camp without the need to identify themselves to security guards.

c) All other visitors may be required to furnish identification; anyone with an unlawful purpose may be denied access.

d) Any visitor specifically designated by a worker will be admitted.

e) The dining hall will be available to the plaintiffs for group meetings of 50

or more once a week. Meetings with less than 50 workers are to be held in the recreation center during any evening.

f) The plaintiffs will refrain from any interference with the defendants' usual processing procedures for newly-arriving workers.

g) Visitors to the hospital must conform to the rules and regulations promulgated by the medical staff.

h) Visitors will be permitted to utilize available parking areas in and around the Camp.

i) Religious services requested by ten or more workers may be held in the chapel.

j) The chapel may be used for Sister Betsy's classes.

k) The plaintiffs will be free to discuss labor-management relationships with the workers and may organize the workers in labor matters. However, the plaintiffs will be enjoined from inciting the workers unlawfully to breach their contracts of employment. In addition, the plaintiffs will refrain from any and all illegal picketing and demonstrations.

*l*) Women will not be allowed in the barracks.

m) Posters not to exceed 8″ x 11″ may be attached to any bulletin boards presently in the Camp.

n) Literature may be distributed among the workers who wish to accept the material.

*o*) The plaintiffs may employ an amplifying system so long as it is reasonably necessary to convey the voice of the speaker to an assembled group.

p) Pending trial, depositions of witnesses may be taken at mutually convenient times and places. Neither side shall depose more than five witnesses without the permission of the Court.

25. The parties have faithfully adhered to the Court's orders. No serious confrontations have occurred. On August 5, 1973, ATA was formed and on August 23, 1973, representatives of ATA traveled to Puerto Rico to meet with the Secretary of Labor of that country in order to gain recognition as the exclusive bargaining agent for migrant workers in the United States. ATA organizers have had full access to workers at the Camp, and at the present time ATA, META and officials of the Association are engaged in informal negotiations. However, there is no assurance that the Association will formally recognize ATA as the labor representative of the migrant workers at the Camp. In fact, it appears that the Association will attempt to continue the recruitment of migrant workers in exactly the same manner as in previous years.

26. A plenary hearing on the merits was conducted by the Court in September 1973, 11 witnesses were heard, oral arguments were presented, and a briefing schedule established.

## II. ISSUES

1. Is there a jurisdictional basis upon which this Court may grant the plaintiffs the relief they seek?

2. May this action be maintained as a class action?

3. Is there an absolute and unconditional right of visitors' access to Camp Windsor?

4. What rules and regulations should govern access and other related matters at Camp Windsor?

5. May the defendants recover on their counterclaim?

## III. CONCLUSIONS OF LAW

■ The Court finds that this action may be maintained pursuant to the provisions of the Civil Rights Act, 42 U.S. C. §§ 1983, 1985(3), and its jurisdictional implementation, 28 U.S.C. § 1343(3), to secure to the plaintiffs their rights under the First and Fourteenth Amendments. See, e. g., Marsh v. Alabama, 326 U.S. 501, 506, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Franceschina v. Morgan, 346 F.Supp. 833, 837 (S.D.Ind.1972); Folgueras v. Hassle, 331 F.Supp. 615, 621–623 (W.D.Mich.1971.).

Another threshold question is whether this action may be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The plaintiffs seek to represent not only themselves but two classes: 1) all the migrant farm workers residing at Camp Windsor; and 2) all persons and organizations that provide supportive services for migrant workers who live at the Camp. The Rule authorizes maintenance of a class action when "the party opposing the class has acted or refused to act on grounds generally applicable to the class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

A class action suit is uniquely appropriate here. The allegations pertain to general violations of the constitutional rights of the two groups as well as the named plaintiffs. At trial, evidence was accepted from persons "similarly situated": 85 migrant workers filed affidavits indicating their support of the plaintiffs' claims, and newsmen testified to their denial of access to the Camp. As a practical matter, these persons could easily have been joined as additional parties. Moreover, the plaintiff classes are adequately represented; no fundamental considerations of due process compel notice. In any event, a class action designation is largely a formality in the instant matter. No monetary relief is sought; the judgment will inure to the benefit not only of the named plaintiffs but all others similarly situated. See Galvan v. Levine, 490 F.2d 1255 (2 Cir. 1973); Bailey v. Patterson, 323 F.2d 201, 206–207 (5 Cir. 1963), cert. denied, 376 U.S. 910, 84 S.Ct. 666, 11 L. Ed.2d 609 (1964).

The principal issue concerns the right of access to the migrant labor camp known as Camp Windsor and necessarily involves the three competing and conflicting interests of the Association, the visitor, and the migrant.

The Association claims that as the owner of property it has the right to bar trespassers, uninvited visitors, unsa-vory elements, representatives of service and labor groups, and any other person or organization which it deems detrimental to its business operations and the welfare of the workers. The plaintiffs seeking access to the workers argue they have the constitutional right to communicate with and to distribute literature to the workers at any time of the day or night, without any restrictions whatever. The migrant workers contend that their federally protected rights of freedom of speech, religion and association insulate them from the Association's rules and regulations governing visitation privileges at the Camp.

■ Applying the controlling principles of law to the facts of this case, it appears to the Court that no one of the positions advanced by the parties appropriately resolves the controversy. While it is true that no "trespasser or any uninvited guest may exercise general rights of free speech on property owned and used nondiscriminatorily for private purposes," Lloyd Corporation v. Tanner, 407 U.S. 551, 568, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131 (1972), it must also be emphasized that ownership does not always mean absolute dominion. Marsh v. Alabama, supra, at 506 of 326 U.S., 66 S.Ct. 276. Whether or not Camp Windsor qualifies as a "company town" within the criteria established in *Marsh,* the Camp is not a family residence or a privately owned island located off the coast of Connecticut. It is the living quarters for hundreds of free citizens of this country and, therefore, the premises are more "public" than "private."

■ Under our Constitution, the residents at the Camp have a right to be properly informed, may openly communicate with others, and, in the absence of good cause, shall enjoy all the liberties exercised by any other citizen. As was stated in People v. Rewald, 65 Misc.2d 453, 318 N.Y.S.2d 40 (1971):

They [the migrants] have under our Constitution a right to free access to information and, most certainly, visitors, such as news reporters, may not

be denied without good cause shown the right of reasonable visitation for purposes of gathering and disseminating news. Thus, camp residents and public alike may be fully informed, may openly communicate their ideas, may intelligently exercise their franchise to vote and, when and if necessary, petition their government for redress of grievances. (See, Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, 1946; National Labor Relations Board v. Lake Superior Lumber Corp., 167 F.2d 147, 6 Cir., 1948). Clearly, in such cases, a sharp distinction arises between private property used solely for the owner's private purposes, where the owner's right to protection against criminal trespass and from invasion of his constitutional right to privacy, will take precedence, and premises which are clearly open and dedicated to public uses.

318 N.Y.S.2d, at 45.

Thus, the ownership rights of the Association in the Camp are not plenary; they do not include the right to suspend the workers' constitutional guarantees of freedom of speech, assembly and religion. See Franceschina v. Morgan, supra; Folgueras v. Hassle, supra.

This is not to say, however, that any and all persons and organizations have an unfettered right of access to the Camp, day or night, or an unrestricted privilege to interfere with the usual business operations of the Association. The Association may properly demand compliance with the workers' contracts of employment and may justifiably insist that its business functions proceed smoothly and efficiently. Cf. Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 320, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Wolin v. Port of New York Authority, 392 F.2d 83, 93 (2 Cir. 1968). Moreover, the migrant workers, most of whom are in a strange land and unable to speak English, have their own right of privacy and should not be subjected to harassment, intimidation, discomfort, or thievery. At trial, several of the migrants stated concern for their personal property if the Camp were left unprotected from malefactors and expressed chagrin that at times they were unwitting victims of professional gamblers who, despite security precautions, had gained entrance to the Camp. Further, the evidence also disclosed that a substantial number of the workers resented the presence of visitors who would foist medical attention, union organization, and charitable works upon them.

Under these circumstances, the Court must attempt to balance and adjust the respective rights and needs of the parties, in the light of the realities of the situation existing at Camp Windsor. Cf. New Jersey v. Shack, 58 N.J. 297, 277 A.2d 369 (1971). The Association undoubtedly enjoys a business advantage by recruiting in Puerto Rico an agricultural labor force for its grower members and it understandably wishes to maintain peaceful relationships with the workers. It believes it has taken no unfair advantage of the workers, pays them fair wages bargained for at "arms length", and provides adequate living conditions. The migrants, on the other hand, recognize they have voluntarily accepted employment in the tobacco fields of New England and that it is financially rewarding. Yet, they resent intrusions on their rights to receive visitors, to hear and read expressions of ideas reflecting on their life at the Camp, and to organize among themselves to improve their working conditions. The third group interested and active in the affairs of the Camp is represented by plaintiff Velez and his associates. They share a genuine concern for the welfare of the workers and, at some personal sacrifice, are determined to give aid and comfort to the workers. Although readily admitting the workers are not treated as slaves or peons, they insist the migrant farm workers are underpaid, overworked, not properly fed, and regarded as "second class" citizens when compared to the living and working condi-

tions of other employees in different areas of employment.

Lines obviously must be drawn; specific standards, requested by all the parties,[1] must be established. On balance, the rules promulgated in Schedule A and attached hereto will, in the Court's opinion, protect the plaintiffs' constitutional rights and yet avoid a basic incompatibility with the normal and necessary activities at Camp Windsor. Cf. Grayned v. City of Rockford, 408 U. S. 104, 115–116, 92 S.Ct. 2294, 33 L.Ed. 2d 222 (1971); Tinker v. Des Moines School District, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Melton v. Young, 465 F.2d 1332, 1334–1335 (6 Cir. 1972); Eisner v. Stamford Board of Education, 440 F.2d 803, 807–808 (2 Cir. 1971).

One final issue remains for decision. The defendants, by way of a counterclaim, seek damages and injunctive relief for the plaintiffs' alleged wrongful interference with the workers' contracts of employment. Since the defendants failed to introduce requisite proof of the allegations set forth in their counterclaim, their affirmative claims for relief are denied.

Accordingly, judgment may enter for the plaintiffs, to the extent consistent with this opinion and Schedule A.

### SCHEDULE A

The rules and regulations promulgated herein shall be incorporated as part of the judgment in the above-entitled case, but may be modified in any respect by mutual agreement of all the parties, or by further order of any court of competent jurisdiction.

1. Visitors shall have free and open access to Camp Windsor daily between the hours 10:00 A.M. to 10:00 P.M. No visitor may remain in the barracks after 9:00 P.M. if one or more workers are asleep therein.

2. Any visitor may be required to identify himself and to state his general purpose if his identity is not known to the security guard or if the security guard has reasonable cause to believe the visitor is attempting to enter the Camp for an unlawful purpose. A visitor specifically designated by a worker or a guest accompanied by a worker shall be admitted promptly.

3. Female visitors may not enter the barracks. (This rule is issued by stipulation of the parties).

4. All buildings and grounds within the Camp may be used as general visiting areas, except the dining hall, chapel, and administrative offices of the Association. However, the chapel, in accordance with previous custom, may be utilized as a classroom, and the dining hall, upon five hours notice to the Association, shall be made available twice a week between the hours 7:00 P.M. to 9:30 P.M. for group meetings of 50 or more persons.

5. Religious services requested by ten or more workers may be held in the chapel.

6. Visitors shall be permitted to use the available parking areas in the Camp.

7. No oral or written communication, expression of ideas or opinions, distribution of literature, or discussion of any subject matter whatsoever shall be prohibited or restricted by the Association.

8. Posters not exceeding 8″ by 11″ may be attached to any bulletin boards presently in the Camp.

9. Amplification systems reasonably necessary to convey the voice of the speaker to the assembled group shall be permitted.

10. There shall be no interference with the procedures for processing newly-arriving workers, or with the usual and customary business operations of the Association.

[1]. The parties have submitted recommended "Rules and Regulations" to be entered as part of the judgment in this case. Obviously any such formulations may not be sufficient to cover every conceivable circumstance. It is hoped, however, that they will provide lines of analysis for future problems if and when they arise.

**1258**

11. Visits to the Camp's hospital shall conform to the reasonable rules and regulations promulgated by the hospital's medical staff.

12. No visitor, worker, or agent of the Association shall engage in any conduct or activity which is proscribed by any local, state or federal law.