[L.A. No. 32129. Nov. 17, 1988.]

SAM ANDREWS' SONS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

158

COUNSEL

Patricia J. Rynn, Lewis P. Janowsky, Rynn & Janowsky, Rynn, Schwartz & Janowsky and Dressler, Quesenbery, Laws & Barsamian for Petitioner.

Daniel G. Stone, Nancy C. Smith, Cathy Christian and Ismael A. Castro for Respondent.

Dianna Lyons, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

## OPINION

**KAUFMAN, J.**—We granted petitions of the Agricultural Labor Relations Board (ALRB or Board) and the United Farm Workers of America, AFL-CIO (UFW or union) for review of a Court of Appeal decision which vacated portions of the Board's order in the underlying unfair labor practice proceedings against Sam Andrews' Sons (the grower), and which also struck the Board's award to the UFW of costs and attorney fees.

The case primarily concerns the authority of the Board to award attorney fees, the scope of union access to a labor camp for organizational purposes and the rights of a labor camp operator to promulgate reasonable regulations for access to a labor camp.

### I. FACTS AND PROCEDURAL HISTORY

The grower raises alfalfa, cotton, melons, lettuce and other vegetable crops in Kern and Imperial Counties. It is an agricultural employer subject

to the Agricultural Labor Relations Act (ALRA). (Lab. Code, § 1140.4, subd. (c).) The Board upheld a 1977 representation election and, as a result, on August 21, 1978, certified the UFW as the exclusive bargaining agent for the grower's agricultural workers. (*Sam Andrews' Sons* (Aug. 21, 1978) 4 ALRB No. 59.)

There had been a history, both before and after certification, of difficulties between the grower and the union regarding access to agricultural employees at the grower's labor camps. (See *Robert S. Andrews* (June 10, 1977) 3 ALRB No. 45 [camp rules excluded families and friends of workers from labor camp barracks and camp kitchen, and restricted union organizers to the company park outside the camp compound; Board ordered grower to cease and desist from denying access to buses and premises, including labor camps, to organizers acting "in accordance with Board's access regulations"]; *Sam Andrews' Sons* (Nov. 30, 1979) 5 ALRB No. 68 [armed security guards at labor camp directed union organizers to meet in the company park outside the camp compound, refused permission to union organizers to enter the barracks, and watched union organizers who did visit workers in barracks; Board orders grower to cease and desist from surveillance of employees during contacts with union organizers].)

A. *Labor Camp Facilities*

The grower operates labor camps to house agricultural workers at both its Kern County and Imperial Valley operations. The Lakeview labor camp, southwest of Bakersfield in Kern County, consists of separately fenced areas containing two barracks buildings or bunkhouses, a kitchen and dining facility, and an equipment storage area. The separately fenced kitchen and dining facility is connected to the barracks area by a fenced walkway. The entire compound is also surrounded by a chain link fence. Immediately outside the camp is a company-owned park.

The nature of the facility in which the workers here live—a communal barracks—is deserving of specific mention. Each of the bunkhouses at the Lakeview camp consists of a single dormitory room containing 60 double bunks (120 beds) arranged in 4 rows. The two outside rows are separated from the two center rows by aisles six to eight feet wide. Partitions are set up to create three-sided cubicles for two double bunks (four beds). The cubicles are open on the side that faces the aisle. The double bunks in each cubicle stand only four feet apart. Each bunkhouse contains a shower and toilet facility and there is also a "lounge" area approximately 10 to 15 feet wide spanning the width of the dormitory room at one end. A single switch controls overhead lights for the entire dormitory room.

In the Imperial Valley, the grower leases a camp facility near Holtville and operates it for its agricultural employees. There is one entrance to the fenced camp, which consists of four concrete block buildings. Two of the buildings are used as bunkhouses, one building contains the kitchen and dining facilities, and another contains shower and bathroom facilities. The bunkhouses are similar to the ones at the Lakeview camp. Each bunkhouse consists of a single room, approximately 20 feet by 70 or 75 feet in size. There are two rows of double bunks in the bunkhouse. Plywood partitions form cubicles around sets of double bunks four feet apart, in a similar fashion to the bunks at the Lakeview camp.

## B. *Background—Summer Strike*

The unfair labor practices under review in the instant case, and in a contemporaneous separate but similar case, arose against the background of a strike against the grower's Kern County operation near Bakersfield mounted by the union in the summer of 1981. Contract negotiations broke down as the summer melon harvest began. The union therefore mounted a strike among the grower's tractor drivers and irrigators. The union decided not to call out the melon pickers (harvest workers), although some harvest workers did participate in the strike.

Apparently, both the union and the grower engaged in abusive conduct at the grower's Kern County fields during the strike. The grower denied access by union representatives to workers in the fields. The union engaged in massive, sometimes destructive and violent, picketing. There were at times as many as 350 pickets at the grower's fields. Picketing at the fields continued on an almost daily basis from the beginning of the strike in July 1981 through January 1982. The field pickets destroyed several thousand feet of irrigation pipe, damaged tractors and buses, and slashed tires and broke car windows of cars belonging to nonstriking workers.

Pickets were also stationed at the grower's Lakeview labor camp nearly every day from July 9, 1981, through the end of November. The Lakeview labor camp primarily housed harvest workers, who were by and large not participating in the strike, although some of the nonstriking tractor drivers and irrigators also moved to the Lakeview camp compound. There was no damage to property at the camp, but nonstriking harvest workers as well as camp security personnel were sometimes pelted with rocks, dirt and eggs as they went in and out of the camp compound, or attempted to prevent picketers from climbing the fences. In August 1981, picketers at the Lakeview labor camp began night picketing in a manner calculated to harass camp residents. The strikers would use bullhorns, bang on trash can lids,

yell at the workers and shine spotlights into the barracks area to prevent the workers from sleeping.[1]

In early August 1981 the union obtained a temporary injunction ordering the grower to allow union representatives access to workers in the Kern County fields. After the union obtained the injunction, the nighttime harassment at the Lakeview camp subsided, and picketing continued without further disruptive incidents. Although there was evidence indicating the Kern County strike continued through January 1982, at the time of the conduct at issue in this case the melon harvest was essentially over. The nonstriking tractor drivers and irrigators were no longer residing at the Lakeview camp and by November 1981 the Lakeview camp was occupied by lettuce harvest workers.

## C. Camp Access Rules

In the summer of 1981, when the strike among tractor drivers and irrigators began during the melon harvest, the grower began to strictly enforce its previously poorly enforced rule prohibiting visitors from entering the Lakeview labor camp compound.[2]

Under the grower's rules, all visitors—including family and friends as well as union representatives or Board agents—were required to present themselves to company security officials and identify the camp resident they wished to see. The security guards would locate the worker and advise him of the visitor's presence. The resident worker would meet with the visitor in the parking lot or in the company park outside the camp compound, but no visitor was allowed inside the camp compound.

## D. Separate Similar Case (8 ALRB No. 87)

It was against this background that unfair labor practice charges in both the instant case and a separate but similar case arose. The similar case

---

[1] After the strike began, one of the grower's actions was to place tarpaulins over the chain link fence surrounding the compound. Although reference has been made throughout the history of this case to the grower's placing the tarpaulins to prevent communication between strikers or union organizers outside the fence with workers inside the compound, the grower's representatives testified the tarpaulins were placed to prevent the shining of lights into the barracks area at night. Nevertheless, even if preventing the pickets from shining lights into the barracks was the true reason for the tarpaulins, the grower was not justified in keeping the tarpaulins in place after the night harassment had stopped for a substantial time.

[2] The grower's "no visitors" rule appears to have been unenforced for a time. However, the grower had a rather consistent policy of restricting access to the camp by nonresidents, having suffered two previous findings of unfair labor practices based on its denial of access to the labor camp. (See *Robert S. Andrews, supra,* 3 ALRB No. 45; *Sam Andrews' Sons, supra,* 5 ALRB No. 68.)

involved roughly contemporaneous alleged denials of labor camp access by the grower in Kern County, while the instant case involves alleged denials of field access in Imperial Valley and alleged denials of camp access in both Kern County and Imperial Valley. The similar but separate case (*Sam Andrews' Sons* [referred to hereafter for convenience as 8 ALRB 87]) was considered twice by the Board (8 ALRB No. 87 (Nov. 30, 1982) and 11 ALRB No. 29 (Dec. 10, 1985)) and generated two conflicting Court of Appeal opinions, as to the latter of which this court granted review. That review remains pending.

Nevertheless, the background of the separate, similar case is significant with respect to the labor camp access issues in this case because both the Board and the Court of Appeal in this case relied on the evidence and the reasoning on the access issues in the separate, similar case (8 ALRB 87).[3] In addition, to avoid confusing the two cases, it is necessary to outline the facts and procedural history of the separate but similar case.

### 1. *The Board's Original Order*

In 8 ALRB 87 the grower was charged with two instances of denying union representatives access to the *Lakeview labor camp* on October 28 and 29, 1981. The grower admitted its agents refused admission to the bunkhouses or the dining hall on the dates in question, in accordance with its policy as outlined above. It argued, however, its visitor rules were justified by the need for security at the camp and the privacy concerns of all camp residents and because admission of visitors to the barracks and dining hall would be unreasonable and disruptive. In addition, the grower asserted the union had reasonable alternative means to communicate with the workers.

The Board found the grower's denial of access constituted an unfair labor practice and ordered the grower to "Cease and desist from: [¶] (a) Preventing, limiting, or restraining any union organizers or agents from entering

---

[3] At the hearing before the administrative law judge (ALJ) in the instant case, the grower argued that the camp access charges should be dismissed because precisely the same issues were being considered by the Board in 8 ALRB 87. The ALJ denied the motion to dismiss, but incorporated the testimony of the grower's witnesses from 8 ALRB 87 into the record of the instant case. After the Board issued its first decision in 8 ALRB 87, the ALJ in the instant case found that the camp access violations here were identical to the access violations in 8 ALRB 87. Thus, the ALJ incorporated by reference the Board's order and decision in 8 ALRB 87. The Board in the instant case approved and adopted the ALJ's decision with respect to the access issue, including the incorporation of the order and decision from 8 ALRB 87, with only minor modifications.

The Court of Appeal in the instant case also relied heavily on the first Court of Appeal opinion in 8 ALRB 87 in affirming the unfair labor practice findings.

and remaining on the premises of Respondent's labor camps for the purpose of contacting, visiting, or talking to any agricultural employee on the premises. [¶] (b) In any like or related manner, interfering with, restraining, or coercing agricultural employees in their right to communicate freely with union organizers or agents on the premises of Respondent's labor camps."

### 2. First Court of Appeal Opinion in 8 ALRB 87

On the grower's petition for review, the Second District, Division Four issued an opinion (*Sam Andrews' Sons* v. *Agricultural Labor Relations Bd.* (1984) 162 Cal.App.3d 923 [208 Cal.Rptr. 812] [the first Court of Appeal decision in 8 ALRB 87])[4] upholding the unfair labor practice finding but vacating the access order as overbroad because it granted the union an unlimited right of access to the labor camp. The court held that (1) the ALRA was intended to provide only a qualified statutory right of access to the grower's property[5] (*Agricultural Labor Relations Bd.* v. *Superior Court* (*Pandol & Sons*) (1976) 16 Cal.3d 392 [128 Cal.Rptr. 183, 546 P.2d 687]), based on similar National Labor Relations Board (NLRB) precedent defining a statutory right of access and embodied in *Labor Board* v. *Babcock & Wilcox Co.* (1956) 351 U.S. 105 [100 L.Ed. 975, 76 S.Ct. 679]; (2) the statutory standard under the *Babcock & Wilcox* rule permitted access to a grower's property where there were no reasonable, practical and effective alternative means of communication; but that (3) the union had sufficiently demonstrated there were no reasonable, practical or effective means of communication other than access to the workers at the camp, particularly in view of the grower's access policies and apparent hostility to attempts to communicate. The court further held that, even if there were a right of access under the federal or California Constitution, a matter which it expressly declined to decide, a First Amendment right of access is not absolute but is subject to the owner's right to make reasonable rules to prevent unnecessary interference with its business activity. (*Petersen* v. *Talisman Sugar Corporation* (5th Cir. 1973) 478 F.2d 73, 82.) The Court of Appeal judgment vacated the Board's order insofar as it included no limitations as to time or number of organizers, and remanded the case to the Board with directions to reframe its order to require reasonable access to the camp and to specify in detail appropriate times and numbers of organizers.

---

[4] A petition for rehearing was denied (Jan. 4, 1985), and petitions for hearing in this court were also denied (Feb. 21, 1985).

[5] In its discussion of the statutory right of access to the grower's property the Court of Appeal did not apparently differentiate between access to the fields (work site) and access to property operated as a labor camp (nonwork site).

### 3. *Board's Order After Remand*

On remand, the Board issued a supplemental decision and order (*Sam Andrews' Sons, supra,* (Dec. 10, 1985) 11 ALRB No. 29). The Board reiterated that, in view of the grower's repeated and egregious violations of employee organizational rights, *it believed unrestricted access was appropriate* and stated its view that an unrestricted access order would not sanction abuses by workers or union organizers. Nevertheless, in order to comply with the remand order, the Board modified its order to restrict access during an eight-hour period when workers could be presumed to be sleeping and during times when *no employees were in the camp.* The Board refused to prohibit organizers from entering the bunkhouses, but did limit the number of organizers permitted in a bunkhouse to one for each ten residents, and set an overall limit that the number of organizers permitted in the camp was not to exceed the number of employees present at the camp at any one time.

In pertinent part, the Board's modified order in 8 ALRB 87 commanded the grower to: "Cease and desist from: [¶] (a) Preventing, limiting or restraining any non-resident union organizers or agents from entering and/or remaining on the premises of Respondent's labor camps for the purpose of contacting, visiting or talking to any agricultural employees on the premises, *unless* such organizers or agents, [¶] (1) are present in a bunkhouse in numbers which exceed one organizer for every 10 employees residing in the bunkhouse; [¶] (2) seek to enter the camp or remain in the camp during an eight-hour period, to be designated by the Regional Director, when the camp residents are usually sleeping; or [¶] (3) exceed in number the number of employees present in the camp. [¶] (b) In any like or related manner, interfering with, restraining, or coercing agricultural employees in their right to communicate freely with union organizers or agents on the premises of Respondent's labor camps." (Italics added. Original italics deleted.)

### 4. *Second Court of Appeal Opinion in 8 ALRB 87*

A different division of the Second District Court of Appeal reviewed the Board's modified order in *United Farm Workers* v. *Agricultural Labor Relations Bd.* (1987) 201 Cal.App.3d 1213 [236 Cal.Rptr. 38], review granted June 18, 1987 (S000868), which shall be referred to hereafter as the second Court of Appeal decision in 8 ALRB 87. This time, Division Seven of the Second District held: (1) The law of the case doctrine did not preclude reconsideration of issues decided in the first review because the court in the first review ignored controlling precedents in reaching its decision (in other words the first decision was legally incorrect). (2) The federal work site

access rule of *Labor Board* v. *Babcock & Wilcox Co., supra*, 351 U.S. 105, relied on by the court in the first decision, is inapplicable to access at a residential labor camp during nonworking time. (3) Although the speech and privacy rights of workers and organizers are not absolute, and although the grower (but not the Board) may impose reasonable restrictions to protect business interests, no restrictions were shown to be necessary. The modified order was therefore vacated and the Board was ordered to reinstate its former order permitting unrestricted access to the camp.

This court granted review as to the second Court of Appeal decision on June 18, 1987, and that review remains pending in this court.

E. *The Instant Case (10 ALRB No. 11)*

1. *The Charges and Board Order*

The case at bench is a separate although similar case arising out of alleged incidents at the Lakeview camp in November 1981 and incidents in the Imperial Valley in December 1981 and January 1982. (*Sam Andrews' Sons* (Mar. 13, 1984, mod. July 20, 1984) 10 ALRB No. 11, referred to for convenience hereafter as 10 ALRB 11.) The specific charges against the grower in the instant case were: Two instances of denying UFW representatives access to the Lakeview labor camp on November 10 and 11, 1981, a separate violation for forcibly ejecting UFW representatives from the Lakeview camp on November 10, 1981, two instances of denying UFW representatives access to the grower's Imperial Valley labor camp on December 7 and 8, 1981, and two instances of denying UFW representatives postcertification access to the grower's Imperial Valley *fields* on December 17, 1981, and January 6, 1982.

On November 10, at approximately 7 or 8 p.m., UFW representative David Villarino and two or three other persons went to the Lakeview camp. According to Villarino's version of events, the grower's security guards confronted them at the front gate and asked Villarino if he was going into the camp. Villarino replied "yes," and entered the barracks with his companions.

One of the security personnel, Steve Rodriguez, testified that a camp resident informed him and two other security guards that nonresident UFW organizers were inside the barracks. Rodriguez and another security guard went inside the barracks where they saw Villarino, whom Rodriguez knew, and two other nonresidents. Rodriguez asked Villarino and his companions to leave. When they refused, Rodriguez escorted them out of the camp.

On November 11, Villarino and several companions attempted to gain access to the camp pursuant to a temporary restraining order (TRO) served on the grower that day. The TRO permitted access by six UFW organizers between 6 and 8:30 p.m. Villarino and three others whom Rodriguez had not seen before approached the camp gate. Rodriguez admitted Villarino, who was known to be a representative, so that Villarino could make a phone call. Villarino's companions were denied entry to the camp, however, assertedly because they did not have proper identification. Villarino and his companions eventually left sometime between 8:30 and 9 p.m.

With regard to the forcible ejection of Villarino from the Lakeview camp on November 10, the evidence showed that security guard Rodriguez physically grabbed Villarino's arm, possibly twisting it behind his back, and at least placed the other hand around Villarino's shoulder while walking him out of the room. Villarino testified he was pushed and shoved out of the barracks.

The grower conceded that it had denied union representatives access to the Imperial Valley labor camp on December 8, 1981.

The grower also conceded it had denied union representatives access to its Imperial Valley fields on December 17, 1981, and January 6, 1982. On December 17, the grower denied field access to a UFW representative. On January 6, a UFW field office director notified the grower, pursuant to the requirements of *O.P. Murphy Produce Co., Inc.* (Dec. 27, 1978) 4 ALRB No. 106 (the leading ALRB case on field access), of the UFW's intent to take field access. The grower stated he would call the UFW representative back, but never returned the call. The UFW representative also contacted the grower's attorney regarding the intended access, but the attorney merely stated that he was unsure of the grower's position with regard to field access in the Imperial Valley.

The ALJ found the denials of access at the Lakeview camp on November 10 and 11, 1981, and at the Imperial Valley camp on December 7 or 8, 1981, were in all respects similar to the denials of access found in 8 ALRB No. 87, and therefore incorporated by reference the Board's decision and order in that case in concluding the grower's conduct violated Labor Code section 1153, subdivision (a). In addition, the ALJ concluded the ejection of Villarino from the bunkhouse on November 10 was forcible and constituted a separate unfair labor practice. The ALJ further concluded the denials of field access were in violation of Labor Code section 1153, subdivision (a). The ALJ therefore recommended a cease and desist order and an order requiring certain affirmative actions by the grower.

The Board "affirmed" (approved and adopted) the findings of the ALJ that the grower had committed unfair labor practices by denying access to the Lakeview camp on November 10 and 11, and to the Imperial Valley camp on December 7 and 8,[6] by forcibly ejecting union representatives from the Lakeview camp on November 10, and by denying access to the Imperial Valley fields on December 17 and January 6.

The Board ordered the grower to "Cease and desist from: [¶] (a) Preventing, *limiting,* or restraining *any* union organizers or agents from *entering and remaining on the premises* of Respondent's *labor camps* for the purpose of contacting, visiting, or talking to any agricultural employee on the premises. [¶] (b) Denying [union] representatives access to bargaining unit employees, at reasonable times, on the property or premises where they are employed, for purposes related to collective bargaining between Respondent and the UFW. [¶] (c) In any like or related manner interfering with, restraining, or coercing any agricultural employee in the exercise of the rights guaranteed by section 1151 of the Agricultural Labor Relations Act (Act)." (Italics added.)

In addition, the Board ". . . also *direct[ed] the Regional Director to seek contempt citations* against Respondent for any on-going or further violations of our access orders." (Italics added.)

The grower was ordered to take affirmative actions, including: "At a time to be determined by the Regional Director, provide the UFW with access to its employees for one hour during regularly scheduled work time, for the purpose of talking with the employees about matters related to collective bargaining between Respondent and the UFW. Access may be taken by two UFW representatives for every fifteen employees in each of Respondent's work crews. After conferring with both the UFW and Respondent, the Regional Director shall determine the manner and most suitable time for the special access. During the one-hour access period, no employee shall be required to be involved in the access activities. All employees shall receive their regular pay for the time away from work. The Regional Director shall determine an equitable payment to be made to nonhourly wage earners for their lost productivity."

Finally, in an expansive order the Board required the grower to pay the union's attorney fees and costs. The Board, citing recent NLRB precedent

---

[6] The grower stipulated to a denial of access to the Imperial Valley camp on December 8, 1981. The ALJ found a denial of access on or about December 7 *or* 8, 1981. The Board purported to "affirm" the ALJ's finding of denials of access on December 7 *and* 8, 1981. To the extent that the Board decision purported to find *two* violations of access at the Imperial Valley camp, it was clearly in error. The parties have not raised this issue, however. Thus, we do not deal with it.

in *Autoprod, Inc.* (1982) 265 NLRB 331 [111 Lab.Rel.Ref. Manual (Bur.Nat.Affairs) p. 1521], purported to require the grower to reimburse *the union* for an extensive array of "costs," stating: "On the authority of *Autoprod, Inc.,* we shall attempt to restore the status quo ante by ordering Respondent to reimburse the Charging Party [UFW] for: [¶] '. . . its costs and expenses incurred in the *investigation, preparation, presentation, and conduct of this proceeding, including salaries, witness fees, transcript and record costs, printing costs, travel expenses and per diem, and such other reasonable costs and expenses as are found appropriate.*' 265 NLRB No. 42 at p. 7." (Italics added.)

## 2. *The Court of Appeal Decision in This Case*

The Court of Appeal in this case noted the facts with respect to the unfair labor practice allegations were nearly identical to those in the first decision of the Court of Appeal in 8 ALRB 87. There, the court upheld findings of unfair labor practices but concluded the remedial order was overbroad.

The Court of Appeal here followed the lead of the court in the first Court of Appeal decision in 8 ALRB 87[7] and held both that the record supported findings of unfair labor practices,[8] and that the Board's order was overbroad.

In particular, the Court of Appeal here adopted the reasoning that (1) the right of access was statutory and not necessarily based on the First Amendment, (2) whether the right of access was statutory or based on the First Amendment, the union's right of access was not unlimited, (3) access could be denied altogether if other reasonable means of communication were available, and (4) the union here made a sufficient showing that in fact there were no alternative reasonable means of communication.

From these principles, extracted from the first Court of Appeal opinion in 8 ALRB 87, the court in this case concluded that, although the union had established a right of access, the Board's order for unlimited access was overbroad. The Court of Appeal here, as in the first Court of Appeal opinion in 8 ALRB 87, vacated the access order and remanded the matter

---

[7] Notably, at the time of the decision in this case, only the first Court of Appeal decision in 8 ALRB 87 had been rendered.

[8] The Court of Appeal based its upholding of the unfair labor practice findings on the additional principle of deference to the Board's ability to evaluate the testimony of witnesses or to exercise informed judgment about matters within its area of special competence. (Cf. *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 490 [95 L.Ed. 456, 468-469, 71 S.Ct. 456].)

to the Board. The Board was directed to reword the order to require the grower to permit *reasonable* access to the labor camp and work place and *to make specific provisions in detail setting limits on time and numbers of organizers*. The court also struck the award of attorney fees and costs as invalid. In addition, the Court of Appeal vacated a portion of the Board's order for one hour of remedial field access on company time, on the ground that the order would permit access to be taken an unlimited number of times and that the financial burden of providing such access on company time was punitive. The Court of Appeal remanded that issue to the Board for further clarification.

We granted review of the court's decision. As shall be seen, we conclude that the Court of Appeal's primary holdings—striking the award of attorney fees, upholding the unfair labor practice findings and vacating the camp access order as overbroad—were correct and should be affirmed. Part of the reasoning underlying the Court of Appeal's conclusions with respect to the unfair labor practice findings and overbreadth of the Board order was erroneous however. Further, the Court of Appeal's order that the Board should make specific detailed provisions setting limits on access was improper and will be reversed. Finally, the portion of the Court of Appeal judgment vacating and remanding the order for one hour of compensated field access was based on a misapprehension of the Board's order and will be reversed.

## II. DISCUSSION

### A. *Attorney Fees and Costs*

 The Board's award of costs and attorney fees to the UFW was based solely on federal NLRB precedent, *Autoprod, Inc., supra,* 265 NLRB 331, which allowed an award of litigation costs against an employer based on the "patently frivolous" actions of the employer. There is, however, no basis for an award against the grower here, even assuming the NLRB precedent was applicable, because there was not nor could there be a finding that the grower's litigation was frivolous or even meritless.

However, the Court of Appeal was correct in further basing its holding on the decision of the United States Supreme Court in *Summit Valley Industries, Inc.* v. *Carpenters* (1982) 456 U.S. 717 [72 L.Ed.2d 511, 102 S.Ct. 2112]. In that case the court held that nothing in the Labor Management Relations Act supports an award of attorney fees in NLRB proceed-

ings or creates an exception to the "American Rule" that attorney fees are generally not recoverable by the prevailing party.[9]

The authority of the Board to award fees is contraindicated by the language of the ALRA and is contrary to Code of Civil Procedure section 1021. Section 1021 provides: "*Except as attorney's fees are specifically provided for by statute,* the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ." (Italics added.)

Labor Code section 1160.3 provides in pertinent part that, if the Board finds an unfair labor practice, it "shall issue and cause to be served . . . an order requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including *reinstatement of employees with or without backpay,* and *making employees whole,* when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, *and to provide such other relief as will effectuate the policies of this part. . . .*" (Italics added.) The general provision that the Board may order such other relief as will effectuate the policies of the Act does not "specifically [provide] . . . by statute" for attorney fees. ▇▇ ▇ ▇▇ ▇▇ (See *Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891 [160 Cal.Rptr. 124, 603 P.2d 41] [statute granting broad general powers to Public Utilities Commission is subject to Code Civ. Proc., § 1021 and does not authorize attorney fee award unless under a recognized exception to § 1021][10].)

---

[9]*Autoprod, Inc.,* the Board's sole authority for the award of attorney fees and costs herein, did not involve reimbursement to a union or an award of attorney fees at all, but rather ordered the employer to reimburse *the NLRB* for the *agency's* expenses in hearing the employer's frivolous claims.

The NLRB in *Autoprod, Inc.* relied exclusively on its decision in *J.P. Stevens & Co., Inc.* (1979) 244 NLRB 407, 408, 409, 458-459, in which the NLRB ordered an employer to reimburse the NLRB and the union for a broad range of expenses, including counsel fees, for its "contumacy" and frivolous litigation. The United States Supreme Court, however, granted certiorari in that case, vacated the judgment of the court of appeals enforcing the NLRB's order (*J.P. Stevens Co., Inc.* v. *N.L.R.B.* (4th Cir. 1982) 668 F.2d 767) and remanded for further consideration in light of *Summit Valley Industries, Inc.* v. *Carpenters, supra,* 456 U.S. 717. (*J.P. Stevens & Co., Inc.* v. *National Labor Relations Board* (1982) 458 U.S. 1118 [73 L.Ed.2d 1381, 102 S.Ct. 3505].) Upon remand, the Fourth Circuit Court of Appeals, upon motion of the NLRB, remanded the case to the NLRB for further proceedings. The parties ultimately entered into a stipulated settlement expressly making *no award* for attorney fees or litigation expenses (*J.P. Stevens & Co., Inc.* (1983) 268 NLRB 89 [114 Lab.Rel.Ref. Manual (Bur.Nat.Affairs) p. 1246]; *J.P. Stevens & Co., Inc.* (1983) 268 NLRB 8 [114 Lab.Rel.Ref. Manual (Bur.Nat.Affairs) p. 1241]).

Thus, the sole authority cited for the award in *Autoprod, Inc.* does not in fact support it. *Autoprod, Inc.* was never itself the subject of enforcement or other review in the federal courts.

[10]It is worthy of note that this court in *Consumers Lobby Against Monopolies* v. *Public Utilities Com., supra,* 25 Cal.3d 891, held that an award of attorney fees by the PUC was *not* au-

■ We note also that the Legislature expressly provided in Labor Code section 1160.3 for "make whole" as to employees and for the Board to order the grower to pay employees for lost wages, even though the NLRA does not contain such specific provisions. (29 U.S.C.A. § 160(c); *Porter Co. v. NLRB* (1970) 397 U.S. 99 [25 L.Ed.2d 146, 90 S.Ct. 821]; *Holtville Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 388, 397 [214 Cal.Rptr. 241].) The Legislature was, of course, well aware of the general rule of the nonrecoverability of attorney fees in this state under Code of Civil Procedure 1021, and the absence from the ALRA of any express provision for the payment of costs and fees to either employees or the union must be considered a deliberate omission by the Legislature.

B. *The Unfair Labor Practice Findings*

■ In affirming the Board's findings that the grower had unlawfully interfered with the union's right of access to the labor camps, the Court of Appeal relied extensively on the first decision of the Court of Appeal in 8 ALRB 87. (*Sam Andrews' Sons* v. *Agricultural Labor Relations Bd., supra,* 162 Cal.App.3d 923.) One conclusion in both decisions was that the federal access rule found in *Labor Board* v. *Babcock & Wilcox Co., supra,* 351 U.S. 105, requiring the union to show it has no reasonable alternative means of communication with the workers, is applicable to the labor camp access problem. Although that did not cause the Court of Appeal here to reverse the unfair labor practice findings, we conclude that the *Babcock & Wilcox* standard is not fully applicable to the labor camp access problem and that therefore some of the language used by the Court of Appeal in both cases was improvident.

---

thorized in ratemaking cases. While this court did authorize an award of attorney fees in reparation cases, we did so on the carefully limited basis that reparation cases create a "common fund"—one of the recognized exceptions to section 1021. (*Id.* at pp. 907 and 908 ["[W]e conclude that the commission possesses equitable power to award attorney fees *under the common fund doctrine in quasi-judicial reparation actions.*"].)

This court has generally recognized only three exceptions to the application of section 1021: the common fund, substantial benefit, and private attorney general theories. (See *Consumers Lobby, supra,* 25 Cal.3d 891, 906; *Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 627, fn. 8 [186 Cal.Rptr. 754, 652 P.2d 985] [*Serrano IV;* noting that, although an exception for bad faith or vexatious conduct is recognized in the federal courts, this court has not considered such an exception]; *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 34 [141 Cal.Rptr. 315, 569 P.2d 1303] [*Serrano III;* adopting private attorney general theory and declining to address any exception for bad faith or oppressive conduct]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10] [declining to recognize the private attorney general doctrine pending consideration by the United States Supreme Court and declining to address the question of an exception for bad faith conduct; cf. *Bauguess* v. *Paine* (1978) 22 Cal.3d 626 [150 Cal.Rptr. 461, 586 P.2d 942] [attorney's alleged misconduct causing mistrial is not within judicially recognized exceptions to section 1021, nor may trial court award fees as sanction under court's inherent supervisory authority].)

*Babcock & Wilcox* involved an employer's no-solicitation rule barring distribution of union literature *at the work site* on *nonwork* time. The United States Supreme Court held that a no-solicitation rule could be valid "if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message . . . ." Conversely, "[W]hen the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." (*Babcock & Wilcox, supra,* 351 U.S. 105, 112 [100 L.Ed. 975, 983].)

In *Republic Aviation Corp.* v. *Board* (1945) 324 U.S. 793 [89 L.Ed. 1372, 65 S.Ct. 982, 157 A.L.R. 1081], a predecessor case to *Babcock & Wilcox,* the court had stated by way of example that reasonable alternatives to communication at the work site would not be available in a case in which the employees lived in "a mining or lumber camp where the employees pass their rest as well as their work time on the employer's premises, so that union organization must proceed upon the employer's premises or be seriously handicapped." (*Republic Aviation, supra,* 324 U.S. 793, 799 [89 L.Ed. 1372, 1377].)

Thus, although *Babcock & Wilcox, supra,* 351 U.S. 105, and *Republic Aviation, supra,* 324 U.S. 793, discussed the labor camp example in the context of determining a lack of alternatives to communication at the work site, both cases imply that the denial of access to a labor camp would be an unfair labor practice, precisely because of a lack of alternative means of communication at the camp.

Although this court referred to the *Babcock & Wilcox* rule in *Agricultural Labor Relations Bd.* v. *Superior Court (Pandol & Sons), supra,* 16 Cal.3d 392, that case, like *Babcock & Wilcox* itself, involved workplace (field) access, not labor camp access.

The Board has repeatedly stated in its decisions that access to agricultural labor camps under the ALRA "is not only legitimate, but crucial to the proper functioning of the Act. See 8 Cal. Admin. Code Sections 20310 (a)(2), 20313, and 20910 (1976); *Mapes Produce Co.,* 2 ALRB No. 54, slip pp. 7-8 ([Oct. 20,] 1976)." (*Silver Creek Packing Company* (Feb. 16, 1977) 3 ALRB No. 13, at p. 4; accord, *Anderson Farms Company* (Aug. 17, 1977) 3 ALRB No. 67, at pp. 21-22; *Merzoian Brothers Farm Management Company, Inc.* (July 29, 1977) 3 ALRB No. 62.) And the statutory right to communication by the union with workers living in a labor camp has been

repeatedly acknowledged by this court. (Lab. Code, § 1152;[11] *Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 317 [172 Cal.Rptr. 720, 625 P.2d 263]; *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654 [205 Cal.Rptr. 657, 685 P.2d 701].)

As a case in point, this court upheld Board regulations requiring an agricultural grower, upon proper notification by a union of taking access, to provide the union with a "prepetition list" including, among other things, the employees' *current street address*. (*Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d at p. 668.) In *Carian,* we noted that, in many cases, the employees' "current street address" would be at the grower's labor camp and that the purpose of providing the prepetition list with "current street addresses" was precisely to permit employees to receive information at locations other than the work site. We acknowledged the Board's conclusions with respect to field access, that because of " '. . . the presence of employer representatives, the short time available [at the work site] during non-working time, plus the limits on the numbers of organizers who may be present under the [access] rule[,] . . .' " field access was " '. . . not the ideal setting for extended or thoughtful discussion of controversial issues.' " (*Carian, supra,* 36 Cal.3d 654, 667, citing *Henry Moreno* (May 11, 1977) 3 ALRB No. 40.) "In light of these practical limitations, the board decided 'to intensify employee access to information during the period when that information is most relevant by providing for unions to receive prepetition lists.' [Citation.] Rather than abandon the access rule, the board explained, it considered the 'goal [of maximizing employee access to information] sufficiently important, and the constraints imposed on the exchange of information as a result of seasonal and migratory labor patterns sufficiently severe, to warrant attempting these two complementary solutions, rather than selecting between them.' [Citation.]" (*Carian, supra,* 36 Cal.3d at p. 667.)

Thus, it is clear that the right of agricultural employees and union representatives to exchange information at an agricultural labor camp is guaranteed under Labor Code section 1152 and does not depend upon proof in each case of the inadequacy of alternative means of communication.

That is not to say, however, that the question of alternative means of communication has no place at all in the resolution of the labor camp access

---

[11] Labor Code section 1152 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of continued employment as authorized in subdivision (c) of Section 1153."

problems. Labor camp access is subject to reasonable time, place and manner regulation, and the reasonableness of regulations in a particular case may properly involve a consideration of the existence of alternative means of communication. The burden will be upon the grower, however, to show the existence of such alternative means of communication and their bearing upon the reasonableness of the regulations prescribed.

The Court of Appeal in this case erroneously relied on the workplace access rule requiring a showing of lack of alternative means of communication.[12] Nevertheless, because the court in fact found a lack of reasonable alternative means of communication aside from labor camp access, it properly affirmed the unfair labor practice finding, even though for an erroneous reason. (See *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

## C. *The Board's Camp Access Order*

### 1. *The Board's Order Was for Unrestricted Access*

█ The Board's order here, like that considered in the first Court of Appeal decision in 8 ALRB 87, mandated unlimited and unrestricted access to the labor camp.

The Court of Appeal here held, correctly, that the right of access is not unlimited but is subject to reasonable regulation. (*Sam Andrews' Sons* v. *Agricultural Labor Relations Bd., supra,* 162 Cal.App.3d 923, 936; see also *Petersen* v. *Talisman Sugar Corporation, supra,* 478 F.2d 73, 82; *United Farm Workers Union, AFL-CIO* v. *Mel Finerman Co.* (D.Colo. 1973) 364 F.Supp. 326.)

The Board, as it did on remand after the first Court of Appeal decision in 8 ALRB 87, attempts to justify its access order on the ground that, though unlimited, the order would not sanction abuses by the union and would not prevent the grower from filing unfair labor practice charges if such abuses occurred. Unfortunately, however, the Board's access order is in fact unlimited and is thus fundamentally at odds with the grower's right to promulgate reasonable time, place and manner regulations. First, the order is by its own terms explicitly unrestricted. It orders the grower to "Cease and desist from . . . [*p*]*reventing, limiting, or restraining any* union organizers or agents from *entering and remaining* on the premises of Respondent's labor

---

[12] To the extent it also adopted the workplace access rule as applicable to labor camp access, the first Court of Appeal decision in 8 ALRB 87, *Sam Andrews' Sons* v. *Agricultural Relations Bd., supra,* 162 Cal.App.3d 923, is disapproved.

camps for the purpose of contacting, visiting, or talking to any agricultural employee on the premises." (Italics added.) The grower is further forbidden "In *any like or related manner* [from] interfering with, restraining, or coercing any agricultural employee in the exercise of the rights guaranteed by [the Act]. . . ." (Italics added.) Second, the unlimited camp access order is in stark contrast to the field access order. The field access order is expressly made subject to access *at reasonable times*. The labor camp access order is clearly not. Third, the Board's decision itself expressly *"direct[s]* the Regional Director *to seek contempt citations* against Respondent *for any* ongoing or further *violations of our access orders."* (Italics added.) Finally, the Board itself clearly intended to order unrestricted access as it candidly stated in respect to its almost identical order in 8 ALRB 87.

The only plausible reading of the Board's decision and order is that it intended—exactly as stated—to preclude the grower from adopting *any limitations or restrictions whatever* on labor camp access. In view of the grower's right to make reasonable regulations as to camp access (see *infra,* section C.2.), the Court of Appeal properly held the order was overbroad and properly vacated the overbroad portion of the order. Its remand to the Board with directions to reframe its order to require the grower to allow reasonable access to the camp will be affirmed.

### 2. *Who Shall Establish Reasonable Restrictions*

As just concluded, the Court of Appeal correctly remanded the case to the Board "for the purpose of rewording its order to require the employer to permit reasonable access to the camp" but, following the lead of the court in the first Court of Appeal decision in 8 ALRB 87, the Court of Appeal in this case added that *the Board* should make "specific provisions in detail, limiting the time, hours of the day or night, number of days per year, number of organizers or United Farm Workers representatives and all in conformity with the views expressed herein." The Board is not, however, the proper entity to establish reasonable restrictions on access in the first instance.[13]

*Petersen* v. *Talisman Sugar Corporation, supra,* 478 F.2d 73 indicates that, even in cases where the right of access is based on the First Amend-

---

[13] This is not to say that the Board could *never,* in a proper case, make an order regarding reasonable limits on camp access. If, after a grower's right to establish reasonable time, place and manner restrictions was confirmed, the grower continued to promulgate unreasonable rules regarding labor camp access, the Board might in such a case properly set reasonable limitations on access. The grower's visitation policies in the instant case were rather clearly not reasonable and, if it were to persist in such policies in the future, it might well be subject to a detailed Board order on the matter.

ment, the *owner* of a labor camp is the proper party entitled to make reasonable regulations for access. The court stated "[w]hile we hold that Talisman must grant access to the migrants in the labor camp, we nevertheless observe that the *owner-employer* may establish reasonable rules for granting access to prevent unnecessary interference with its business activities." (Italics added, *Petersen, supra,* 478 F.2d at p. 82.)

Similarly, in *National Labor Rel. Bd.* v. *Lake Superior Lumber Corp.* (6th Cir. 1948) 167 F.2d 147 it was not the NLRB which created the restrictions at issue there. Rather, the court stated that, "The Board recognized . . . that such right [of access to the employer's property under the NLRA] of an employee or a union representative is not unlimited. Reasonable rules *by the employer* limiting the exercise of this right, which are necessary in order to maintain production or discipline, will be upheld. The 'lights out at 8:00 p.m.' rule in the present case, which would bar union activities after that hour is an example of such a rule." (*Id.,* at p. 151, italics added.)

The nature of restrictions which are deemed "reasonable" will of course depend upon the circumstances. It is beyond cavil that union organizers and others do not have an unfettered right of access to the camp at all hours of the day or night. (See *Velez* v. *Amenta* (D.Conn. 1974) 370 F.Supp. 1250, 1256.)

In *National Labor Rel. Bd.* v. *Lake Superior Lumber Corp., supra,* 167 F.2d 147 the Sixth Circuit Court of Appeals, applying federal labor standards under *Republic Aviation, supra,* 324 U.S. 793 to access to a lumber camp, upheld a lights-out rule excluding all visitors from the camp after 8 p.m. The exclusion of visitors from the bunkhouses and restriction of visitation to the recreation hall before lights-out was a "much closer question." The court ultimately affirmed an NLRB order permitting access to the bunkhouse upon a showing that employees spent most of their limited free time socializing in the bunkhouse, no evidence that any of the woodsmen objected to union activities in the bunkhouse, and that no rule prohibiting union activities in bunkhouses was in effect in other camps throughout the territory.

On the other hand, the United States District Court in *United Farm Workers Union, AFL-CIO* v. *Mel Finerman Co., supra,* 364 F.Supp. 326, considering the scope of access to an agricultural labor camp consisting solely of group living facilities, upheld exclusion of all visitors from the bunkhouses and dining hall. "Ordinarily, the Court would permit the designated representatives to have access to the facilities (bunkhouse, dining hall and bath and toilet facilities) upon invitation by any occupant. Because of

the nature of the facilities . . . it is not feasible for [the union's] designated representatives to carry on their organizing efforts within the facilities without invading the privacy of those migrants who have not invited the designated representative into the facilities. Therefore, the realities of the factual situation require that the designated representatives shall not enter any of the facilities to carry on their organizing efforts." (*Id.*, at p. 329.)[14]

### 3. *Restrictions on Access "in the Home"*

■ The fact that the employees live at the camp does not preclude the grower from making reasonable regulations governing access to a communal bunkhouse simply because the bunkhouse is the workers' "home." The employees' statutory right of access, characterized in some cases as a right to be visited "in the home," in fact refers to the right to communicate with union representatives *where the employees live,* i.e., *at the labor camp,* not necessarily in the communal bunkhouse.[15]

Rather, a reasonable construction of the prior cases supports the view that workers in a labor camp have a right to be visited *at the camp* (the workers' "home"). Any rule to the contrary would most certainly impinge upon the rights, both statutory and constitutional, of employees residing in the communal bedroom not to suffer visits by unrestricted numbers of union representatives at any and all hours of the day and night and upon the grower's right to insure peace and quiet for the employees during normal sleeping hours.

For example, *Merzoian Brothers Farm Management Company, Inc., supra,* 3 ALRB No. 62, involved the complete denial of access to the camp by locking the gates of the fenced camp compound at night. In finding such conduct to be an unfair labor practice the Board majority stated: "The right of employees who are residents of a labor camp to receive visitors is *akin to*

---

[14] The first Court of Appeal decision in 8 ALRB 87, *Sam Andrews' Sons* v. *Agricultural Labor Relations Bd., supra,* 162 Cal.App.3d 923, is also disapproved to the extent it employed the same procedure of ordering the Board to establish restrictions in the first instance.

[15] Notwithstanding occasional references to the right of a worker to communicate with union representatives in the worker's "home," a close examination of the prior decisions reveals that exclusion from the camp generally is what had occurred. (*Vista Verde Farms* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 307 [complete exclusion of union organizers from the labor camp]; *Karahadian Ranches, Inc.* v. *Agricultural Labor Relations Bd.* (1985) 38 Cal.3d 1, 8 [210 Cal.Rptr. 657, 694 P.2d 770] [union organizer lawfully present *in the camp kitchen*]; *Silver Creek Packing Company, supra,* 3 ALRB No. 13 [exclusion of outsiders from locked and guarded *camp;* also, workers actually housed in separate cabins]; *Anderson Farms Company, supra,* 3 ALRB No. 67 [all access to camp barred except between 5:30 and 8:30 p.m.]; *Merzoian Brothers Farm Management Company, Inc., supra,* 3 ALRB No. 62 [complete denial of access to camp by locking gates at night].)

*the rights of a person in his own home or apartment.* The owner or operator of a labor camp cannot exercise for the worker his right not to receive visits from union organizers. . . . [A]ccommodation must be made for the rights of not just the owner and the organizer, *but also for the tenant who has a basic right to control his own home life.*" (*Id.,* at p. 4, italics added.)

By a parity of reasoning, where the living situation is *not* akin to one's own home or apartment, and where exercise by one tenant of "control" over his or her "home life" by inviting visitors into the communal bunkhouse will inevitably impinge on the right of others in the group living situation to exercise control over *their* "home life," reasonable time, place and manner restrictions may, where appropriate, exclude visitors from a communal bunkhouse. Indeed, a grower/labor camp operator charged with the duty to maintain order in its group housing facilities must of necessity make reasonable time, place and manner restrictions on visitation.

D. *The One-hour Expanded Field Access*

■ The Board ordered the grower to provide one hour of compensated access time during working hours.[16] The Court of Appeal reversed the order for one hour of expanded field access as indefinite and overbroad, reading the order to place "no limit on the number of times the union could utilize the right of access" and "purely punitive."

The field access order is reasonably interpreted to refer to one and only one hour of expanded field access, on one agreed-upon day, not one hour each day. Moreover, the grower's argument that the extra hour of affirmative field access, at company expense, was punitive because the unfair labor practices involved *denial of labor camp access* is easily answered: The expanded field access was justified in this case on the basis of the grower's admitted denials of *field* access. There is no need whatever to attempt to justify it on the basis of wrongful denial of *labor camp* access.

---

[16] That portion of the order read: "At a time to be determined by the Regional Director, [Respondent is ordered to] provide the UFW with access to its employees for one hour during regularly scheduled work time, for the purpose of talking with the employees about matters related to collective bargaining between Respondent and the UFW. Access may be taken by two UFW representatives for every fifteen employees in each of Respondent's work crews. After conferring with both the UFW and Respondent, the Regional Director shall determine the manner and most suitable time for the special access. During the one-hour access period, no employee shall be required to be involved in the access activities. All employees shall receive their regular pay for the time away from work. The Regional Director shall determine an equitable payment to be made to nonhourly wage earners for their lost productivity."

## III. Disposition

The portions of the Court of Appeal's judgment vacating the special compensated one-hour field access provision of the Board's order and directing the Board to establish specific limitations on access are reversed. Otherwise, the judgment of the Court of Appeal is affirmed and each party is ordered to bear its own costs on review.

Lucas, C. J., Panelli, J., and Eagleson, J., concurred.

**ARGUELLES, J.,** Concurring.—I agree with the majority opinion that the Agricultural Labor Relations Act (ALRA) does not preclude the establishment of reasonable "time, place and manner" regulations for labor camp access, and that, at least in the first instance, the grower, rather than the Agricultural Labor Relations Board (ALRB), is the appropriate entity to fashion the regulations governing access to a labor camp on a grower's property. I write separately only because I believe that with respect to an ancillary issue—the attorney fee and costs question (see *ante,* pp. 171-173)—the majority opinion unwisely ventures beyond what is necessary to decide the present case and imposes an overly broad and unjustified limitation on the ALRB's general remedial authority in unfair labor practice proceedings.

In this case, the ALRB, after finding that the grower had committed a number of access violations over several years, added to its remedial order a requirement that the grower pay the attorney fees and costs incurred by the union in pursuing its unfair labor practice complaint. The majority opinion initially concludes that the ALRB's award of attorney fees and costs cannot be sustained because, in view of the majority's ultimate conclusion on the labor camp access issue, the grower's litigation was not "frivolous or even meritless." (*Ante,* p. 171.) That conclusion in itself is sufficient to justify the reversal of this portion of the ALRB's remedial order, and there is no reason to go any further in this case.

The majority opinion, however, goes on to declare broadly that the ALRB has no authority to award costs or attorney fees in *any* unfair labor practice proceeding, apparently even when a grower or a union does pursue a patently frivolous claim or defense in bad faith. (*Ante,* pp. 171-173.) Although the majority relies on the United States Supreme Court's decision in *Summit Valley Industries, Inc.* v. *Carpenters* (1982) 456 U.S. 717 [72 L.Ed.2d 511, 102 S.Ct. 2112] and the general provisions of section 1021 of the Code of Civil Procedure to support its sweeping restriction on the

ALRB's authority to require a party to bear attorney fees or costs in any instance, neither authority supports the majority's broad ruling.

In *Summit Valley, supra,* 456 U.S. 717, the Supreme Court held only that, pursuant to the normal "American Rule" on attorney fees, an employer could not *routinely* obtain attorney fees as a part of the statutory "damages" available in an enforcement action under section 303 of the federal Labor Management Relations Act. (456 U.S. at pp. 721-727 [72 L.Ed.2d at pp. 515-519].) In the course of its opinion, the *Summit Valley* court explicitly noted that one of the established exceptions to the "American Rule" recognized by federal courts permits an award of attorney fees against a party who litigates in "bad faith." (See 456 U.S. at p. 721 [72 L.Ed.2d at p. 516] [citing *Vaughan* v. *Atkinson* (1962) 369 U.S. 527 [8 L.Ed.2d 88, 82 S.Ct. 997]].) *Summit Valley* neither holds nor in any way suggests that an administrative agency, such as the National Labor Relations Board (NLRB), may not properly award attorney fees or costs when it finds that a party has pursued a frivolous claim in bad faith.

Indeed, although the majority takes no note of the fact, the NLRB has for more than 15 years followed just such a policy in fashioning remedial orders in unfair labor practice proceedings. (See generally 2 Morris, The Developing Labor Law (2d ed. 1983) pp. 1680-1681.) In *Tiidee Products* (1972) 194 NLRB 1234 [79 Lab.Rel.Ref. Manual (Bur.Nat. Affairs) p. 1175 (hereafter LRRM)] (enforced *sub nom., International U. of Electrical, R. & M. Wkrs.* v. *N.L.R.B.* (D.C. Cir. 1974) 502 F.2d 349, 351-355, cert. den. (1974) 417 U.S. 921 [41 L.Ed.2d 226, 94 S.Ct. 2629]), the NLRB, while noting that "[n]ormally . . . litigation expenses are not recoverable by the charging party in Board proceedings . . .," concluded that an exception to this general rule was warranted where a party, in bad faith, pursues a frivolous claim. The board observed: "[F]rivolous litigation such as this is clearly unwarranted and should be kept from the nation's already crowded court dockets, as well as our own. . . . The policy of the Act to insure industrial peace through collective bargaining can only be effectuated when speedy access to uncrowded Board and court dockets is available. Accordingly, in order to discourage future frivolous litigation, to effectuate the policies of the Act, and to serve the public interest, we find that it would be just and proper to order [the employer] to reimburse the Board and the Union for their expenses incurred in the . . . conduct of these cases, including . . . reasonable counsel fees . . . and record costs . . . ." (79 LRRM at p. 1179.)

The NLRB has continued to apply the *Tiidee Products* "patently frivolous" rule (*supra,* 79 LRRM 1175) in the years following the *Summit Valley*

decision, *supra,* 456 U.S. 717 (see, e.g., *Market King, Inc.* (1987) 282 NLRB 123 [124 LRRM 1150, 1151-1152]; *Hydrotherm Inc.* (1986) 280 NLRB 167 [123 LRRM 1342, 1343]), and federal courts have likewise continued to impose such sanctions on parties to unfair labor practice proceedings on finding that the party has acted in bad faith in pursuing a patently frivolous claim. (See, e.g., *Palmas Del Mar Co.* v. *N.L.R.B.* (1st Cir. 1986) 797 F.2d 39, 40-41.) Thus, *Summit Valley* clearly does not support a rule barring the ALRB from awarding attorney fees or costs to deter frivolous litigation.

Section 1021 of the Code of Civil Procedure similarly does not support the majority's broad conclusion. Section 1021 provides that "[e]*xcept as attorney's fees are specifically provided for by statute,* the measure and mode of compensation of attorneys . . . is left to the agreement . . . of the parties . . . ." (Italics added.) Although the ALRA contains no provision addressed specifically to attorneys fees, the ALRA does contain a provision giving the ALRB broad remedial power in unfair labor practice proceedings, authorizing the agency to order a party who commits an unfair labor practice "to take affirmative action . . . and to provide such other relief as will effectuate the policies of this part. . . ." (Lab. Code, § 1160.3.) Section 1160.3 was modeled directly on the analogous provision of the National Labor Relations Act (see *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 865 & fn. 5 [176 Cal.Rptr. 753, 633 P.2d 949]), which, as the *Tiidee Products* rule, *supra,* 79 LRRM 1175, demonstrates, has long been construed to permit the NLRB to impose a sanction of attorney fees and costs in unfair labor practice proceedings when it finds that a party has pursued a patently frivolous claim. In view of the parallel nature of the state and federal provisions, the Legislature evidently intended to authorize the ALRB to impose at least the same range of sanctions as the NLRB may impose, including an award of attorney fees and costs against parties who in bad faith pursue patently frivolous claims. (See Lab. Code, § 1148 ["The [ALRB] shall follow applicable precedents of the National Labor Relations Act, as amended."]; *Highland Ranch, supra,* 29 Cal.3d 848, 865.)

Contrary to the majority's suggestion, this court's decision in *Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891 [160 Cal.Rptr. 124, 603 P.2d 41] (hereafter *CLAM*) is in no way inconsistent with the ALRB's exercise of such authority. In *CLAM* we held that even in the absence of express statutory authority the Public Utilities Commission has the power in a quasi-judicial proceeding to award attorney fees pursuant to the same equitable doctrines that may be invoked by trial courts. (See 25 Cal.3d at pp. 906-909.) Nothing in *CLAM* suggests that when—as here— the Legislature has granted an administrative agency broad remedial au-

thority in a statutory provision modeled on a federal statute which has previously been construed to authorize the award of attorney fees against frivolous litigation, the state legislation should not be interpreted to grant the state agency comparable authority to award such fees.

Indeed, it is arguable that, even without regard to Labor Code section 1160.3, the *CLAM* decision would support the ALRB's authority to require a party who engages in frivolous litigation to bear its adversary's attorney fees. As noted, in *CLAM* the court held that in a quasi-judicial administrative proceeding the Public Utilities Commission possesses authority to award attorney fees on the same basis on which a trial court may impose such fees in a judicial proceeding. (*CLAM, supra,* 25 Cal.3d at pp. 907-908.) As we have seen, federal decisions have long recognized a court's equitable authority, even in the absence of statute, to award attorney fees against a party who has acted in bad faith (see, e.g., *Vaughan* v. *Atkinson, supra,* 369 U.S. 527), and the California Legislature has recently codified this "frivolous litigation" or "bad faith" exception to the "American Rule" in section 128.5 of the Code of Civil Procedure, which provides that trial courts may order a party "to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." If, as *CLAM* suggests, an administrative agency may, at least in some circumstances, award attorney fees on the same basis as trial courts, section 128.5 of the Code of Civil Procedure may provide an alternative source of authority for an ALRB order requiring a party who has pursued a frivolous claim or defense in bad faith to bear attorney fees incurred by its adversary.

In sum, I think the majority opinion errs in concluding that the ALRB may *never* order a party in an unfair labor practice proceeding to bear another party's attorney fees or costs. There is, however, no need to resolve that broad question in this case. As the majority opinion properly notes, in light of its conclusion with regard to the issue of labor camp access, the grower's position in this case cannot be found patently frivolous. I would reverse the attorney fee and costs order at issue here on this narrow ground alone.

**BROUSSARD, J.,** Concurring and Dissenting.—I concur in the judgment. I also join in Justice Arguelles's discussion of the issues of costs and attorney fees. I write separately, however, to express my disagreement with the majority's analysis of restrictions on union access to labor camps. In a case in which the court upholds a decision by the Agricultural Labor Relations Board (ALRB or Board) finding the grower's restriction on labor camp access invalid, the majority have managed to write an opinion more con-

cerned with the hypothetical rights of the grower than with the violated rights of the union.

I agree with the majority's resolution of the access issue in the following respects. The federal work site access standard enunciated in *Labor Board v. Babcock & Wilcox Co.* (1956) 351 U.S. 105 [100 L.Ed. 975, 76 S.Ct. 679], requiring the union to establish the unavailability of reasonable alternative channels of communication, does not govern access to California agricultural labor camps. The statutory right of union representatives and agricultural workers to communicate at labor camps is not dependent upon the absence of alternative channels of communication. Rather, the burden is on the grower to justify restrictions on access, and to establish that reasonable, effective channels of communication remain available. The grower in this case did not meet its burden, and the Board properly found that the grower's denial of access to the labor camp constituted an unfair labor practice.

The majority's analysis of the access issue is, however, wholly inadequate. Disputes concerning union access to employees at the employer's private property require accommodation of the statutory and constitutional interests of the union, employees and employer. The majority do not identify or weigh the relative strength of the parties' interests in questions concerning labor camp access, nor do they contrast those interests with the interests applicable to the work site.

Although they acknowledge in passing the unreasonableness of the restrictions imposed by Andrews, the majority barely discuss the interests supporting camp access which render those restrictions invalid. They fail to acknowledge that workers and union organizers have constitutional speech rights, as well as statutory rights, which are implicated by restrictions on access to residential labor camps and which necessarily define the permissible parameters of such restrictions. Instead, they focus almost entirely on the right of growers to impose restrictions on access, and fail to acknowledge the limited character of the interests which could legitimately support restrictions on access to worker's homes during nonworking hours. This is a particularly curious approach in a case where the grower's interest in restricting access was so clearly outweighed by the interest of the workers and the union in uninhibited communication. In addition, the majority opinion fails to provide a workable standard for assessing the validity of future restrictions on labor camp access.

### STATUTORY ACCESS RIGHTS

The Agricultural Labor Relations Act (ALRA or Act) guarantees agricultural workers the right "to self-organization, to form, join, or assist labor

organizations, [and] to bargain collectively through representatives of their own choosing . . . ." (Lab. Code, § 1152). The organizational rights extended to workers under the Act "are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others." (*Central Hardware Co.* v. *NLRB* (1972) 407 U.S. 539, 543 [33 L.Ed.2d 122, 126, 92 S.Ct. 2238]; see also Cal. Code Regs., tit. 8, § 20900, subd. (b).) Therefore, union access to workers is " 'crucial to the proper functioning of the Act.' " (*Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 317 [172 Cal.Rptr. 720, 625 P.2d 263], quoting *Silver Creek Packing Co.* (Feb. 16, 1977) 3 ALRB No. 13, p. 4.)

When the union seeks to engage in organizational activities on property owned by the employer, tension arises between the organizational rights of the union and employees on one hand and the property rights of the grower on the other. Accommodation of the various interests ". . . may fall at differing points along the spectrum depending on the nature and strength of the respective [statutory] rights and private property rights asserted in any given context." (*Hudgens* v. *NLRB* (1975) 424 U.S. 507, 522 [47 L.Ed.2d 196, 208-209, 96 S.Ct. 1029].)

As the majority note, the United States Supreme Court enunciated the federal rule governing union access to the work site in *Labor Board* v. *Babcock & Wilcox, supra,* 351 U.S. 105. "[A]n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution." (*Id.* at p. 112 [100 L.Ed. at p. 982].)

The majority acknowledge that the *Babcock* standard does not govern union access to agricultural labor camps. They reason that the union's right of access to agricultural labor camps is guaranteed under the ALRA because communication with employees is necessary to facilitate the goals of the Act and an absence of alternative means of communication is presumed. While this is a correct statement of the law, further explanation is needed to make clear why statutory access rights in the agricultural labor camp setting are *more expansive* than in the work site.

It is well established that the unique characteristics of agricultural labor make effective communication difficult to achieve whether access to em-

ployees is sought at the work site or at workers' residences.[1] Thus, the Board has interpreted the Act to provide a right of access to the work site as well as to labor camps. Statutory access rights vary from one context to another. In particular, the burden of establishing the existence or nonexistence of alternative channels of communication varies according to the context in which the access issue is raised.

In the organizational context, when workers must decide whether they desire union representation and, if so, which agent will serve as their exclusive bargaining representative, access to the work site is governed by an administrative regulation established by the Board. (Cal. Code Regs., tit. 8, § 20900.) The regulation permits qualified access to employer property for organizational purposes with specific limitations on time and place, and on the number of organizers permitted to participate.

This court upheld the constitutionality of the Board's access regulation in *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392. We reasoned that the incidental interference with the employer's property interests occasioned by permitting qualified organizational access was outweighed by the governmental policy in favor of the rights of workers to organize and to collectively bargain. (*Id.* at pp. 404-409.)

We also upheld the regulation against a challenge that it departed from the federal balancing standard enunciated in *Babcock Co., supra,* 351 U.S. 105 and effectively created an irrebuttable presumption that effective alternative channels of communication were unavailable. (*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d at pp. 413-416.) We reasoned that the Board "did not adopt the NLRB practice on the access question because it determined that significant differences existed between the working conditions of industry in general and those of California agriculture." (*Id.* at p. 414.)

In the postcertification context, after the workers have chosen an exclusive bargaining representative and collective bargaining is in progress, access is necessary to facilitate the right and duty of the exclusive bargaining

---

[1] Organizing agricultural workers is difficult because: 1) the workforce is primarily migrant and cannot effectively be reached at permanent addresses; 2) workers move from site to site, often arriving at different times of the day; 3) there are usually no adjacent public areas where the workers congregate or through which they regularly pass; 4) substantial percentage of agricultural workers speak a language other than English; 5) many agricultural workers are illiterate; and 6) elections under the ALRA happen very quickly. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 414 [128 Cal.Rptr. 183, 546 P.2d 687]; See also Cal. Code Regs., tit. 8, § 20900, subd. (c); *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 666 [205 Cal.Rptr. 657, 685 P.2d 701].)

agent to bargain collectively on behalf of the employees it represents. In that setting, access is governed by the Board's opinion in *O.P. Murphy Produce Co., Inc.* (Dec. 27, 1978) 4 ALRB No. 106) which held that access questions should be determined on an ad hoc basis. (*Id.* at p. 8.) Thus, instead of specific provisions, the Board elected to enunciate general guidelines governing postcertification access.[2] The Board further observed that in both the preelection and postcertification contexts, effective alternative channels of communication were generally unavailable. (*Id.* at p. 7.) Accordingly, it established a presumption—rebuttable by the *employer*—that no such alternative channels exist. (*Id.* at p. 8; *F & P Growers Assn.* v. *Agricultural Labor Relations Bd.* (1985) 172 Cal.App.3d 1127, 1132 [218 Cal.Rptr. 736].)

In the strike context, questions concerning work site access are governed by the Board's decision in *Bruce Church, Inc.* (Sept. 18, 1981) 7 ALRB No. 20.) In *Bruce Church,* the Board recognized the right of the union during a strike to communicate with nonstriking employees. (*Id.* at pp. 20-21.) It also recognized the employer's countervailing interest in the continued operation of its business and the nonstriking employees' interest in being free from intimidation or coercion. (*Id.* at pp. 29-30.) To accommodate these potentially conflicting interests, the Board: 1) limited the number of access takers to one for every fifteen employees; 2) reduced the frequency of access to less than that which it found appropriate in the organizational context; and 3) limited access to lunchtime only. (*Id.* at pp. 29-30.) These guidelines only apply if the *union* establishes that picketing is not an effective means of communication and that no other effective means exist.

All of these decisions, however, govern access to a work site. Questions involving a labor camp require a different analysis. As the majority observe, the Board has held that the Act guarantees the right of employees to communicate with organizers at their homes, wherever those homes are located. (*Silver Creek Packing Company, supra,* 3 ALRB No. 13, at p. 4; *Anderson Farms Company* (Aug. 17, 1977) 3 ALRB No. 67, at p. 21-22; *Merzoian Brothers Farm Management Company, Inc.* (July 29, 1977) 3 ALRB No. 62, at pp. 3-4.) "[C]ommunication at the homes of employees is not only legitimate, but crucial to the proper functioning of the Act. [Citations] An employer may not block such communication. The fact that an

---

[2] The Board determined that: 1) access must be related to the collective bargaining process; 2) the labor organizer must give notice to the employer and seek his or her agreement before entering the employer's premises; 3) the labor organization must provide the number and names of the representatives who wish to take access, and the times and locations of access; 4) the parties must act in good faith to reach agreement about post-certification access; and 5) the right of access does not include conduct disruptive of the employer's property or agricultural operations. (*Id.* at pp. 9-10.)

employer is also a landlord does not give him a license to interfere with the flow of discourse between union and worker." (*Silver Creek, supra,* 3 ALRB No. 13, at p. 4.) We agreed with these principles, and adopted the Board's finding that " 'When an employer . . . uses his power as landlord to dictate to employees that they cannot receive union visitors in their own homes, that action is in itself an awesome display of power which cannot but chill enthusiasm for union activity. The normal effect of such a showing of control over employees' lives is to give workers a sense of futility and thereby restrain the exercise of self-organizational rights in violation of the Act.' " (*Vista Verde Farms* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 307, 317.)

While an employer has a legitimate property interest in the productivity of employees at the work site, it does not have a comparable interest in the activities of employee-residents at home during nonworking hours. (*Republic Aviation Corp.* v. *Board* (1945) 324 U.S. 793, 803-804 [89 L.Ed. 1372, 65 S.Ct. 982, 157 A.L.R. 1081].) Thus, in the labor camp, as contrasted with the work site, the workers' interest in unimpeded access is substantial while the landowner's interest in restricting access is relatively limited. Accommodation of these interests results in a broader standard of access to labor camps. Accordingly, the *Babcock* standard (*supra,* 351 U.S. 105) is entirely inapplicable; the statutory right of the union and workers to communicate at labor camps exists independently of proof or presumption of the absence of alternative channels of communication.

## CONSTITUTIONAL ACCESS RIGHTS

While the majority acknowledge the statutory guaranty of access to labor camps, they completely ignore the constitutional underpinnings of labor camp access rights. The majority note that camp access is subject to reasonable time, place and manner regulation, but they do not recognize that constitutional principles necessarily define the outer limits of those restrictions.

Even before the Legislature codified protections for agricultural labor organizing activities, this court made it clear that union representatives and workers have reciprocal labor camp access and speech rights under both the federal and state Constitutions. (*United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 910 [122 Cal.Rptr. 877, 537 P.2d 1237].) In that pre-ALRA decision, Justice Mosk wrote for the majority that a "labor housing facility is not, of course, the equivalent of a prison isolation block, impervious to visitation. . . . [¶] . . . Labor organizing activities, including

picketing, are equally protected by the free speech provisions of our state Constitution. [Citations.]" (*Id*. at pp. 910, 912.)

The primary authority upon which we relied in support of our conclusion that access to labor camps is a First Amendment right was *Petersen* v. *Talisman Sugar Corporation* (5th Cir. 1973) 478 F.2d 73. (See also *Ill. Migrant Council* v. *Campbell Soup Co.* (7th Cir. 1978) 574 F.2d 374; *Velez* v. *Amenta* (D.Conn. 1974) 370 F.Supp. 1250; *United Farm Workers Union, AFL-CIO* v. *Mel Finerman Co.* (D.Colo. 1973) 364 F.Supp. 326; *Franceschina* v. *Morgan* (S.D.Ind. 1972) 346 F.Supp. 833; *Folgueras* v. *Hassle* (W.D.Mich. 1971) 331 F.Supp. 615.) Like the instant case, *Petersen* did not involve state action in the traditional sense. Instead, it relied upon the "company town" theory articulated in *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276]. Under this view, although the First Amendment is limited by a state action requirement, "where private interests were substituting for and performing the customary functions of government, First Amendment freedoms could not be denied where exercised in the customary manner on the town's sidewalks and streets." (*Lloyd Corp.* v. *Tanner* (1971) 407 U.S. 551, 562 [33 L.Ed.2d 131, 139, 92 S.Ct. 2219].) Our adoption of this analysis demonstrates that we considered labor camps analogous to company towns for the purpose of scrutinizing an employer-landowner's restrictions upon its employee-tenants rights of free speech, association and privacy.[3]

Under the "company town" theory, private property is subject to the same First Amendment standards to which public property is subject. (*Marsh* v. *Alabama, supra,* 326 U.S. 501.) Under established constitutional principles, the government may incidentally regulate speech activity by imposing reasonable nondiscriminatory time, place and manner restrictions which are narrowly drawn to protect significant state interests. (*Grayned* v. *Rockford* (1971) 408 U.S. 104, 115-118 [33 L.Ed.2d 222, 231-234, 92 S. Ct. 2294]; *Cox* v. *Louisiana* (1965) 379 U.S. 559, 562-564 [13 L.Ed.2d 487, 490-492, 85 S.Ct. 476].) The interests which the government may legitimately seek to protect depend, in part, upon the purposes for which the property is generally used. (*Heffron* v. *Int'l Soc. for Krishna Consc.* (1980) 452 U.S. 640, 650-651 [69 L.Ed.2d 298, 308-309, 101 S.Ct. 2559]; *Grayned, supra,* 408 U.S. at p. 116 [33 L.Ed.2d at p. 232]; *Tinker* v. *Des Moines School*

---

[3] Indeed, it would be difficult to imagine a situation more analogous to a "company town" than the migrant labor camp in this case. Workers are housed in barracks, behind tall fences and a guardhouse, far from town, where they eat and sleep under the supervision of the same landowner for whom they toil in the fields all day. An employer who can determine who may properly meet and speak with his employees during both working and nonworking hours effectively exercises a sort of totalitarian control far surpassing any permissible state action, except with regard to convicts and the insane.

*District* (1969) 393 U.S. 503, 513 [21 L.Ed.2d 731, 741-742, 89 S.Ct. 733].) Accordingly, the reasonableness of any given restriction will depend in part, on whether the restricted speech activity is compatible with the normal uses of the property. Moreover, the government may not deny access to property which it has opened to the public unless it establishes that effective alternative means of communication are available. (*Heffron, supra,* 452 U.S. at p. 654 [69 L.Ed.2d at p. 311].)

Application of these standards to the regulations on access imposed by Andrews demonstrates their clear unconstitutionality. The primary purpose of a labor camp is to provide room and board for migrant agricultural workers. Thus, the grower may only restrict speech activity which would interfere with the running of a communal residence, and only then if the restrictions are narrowly drawn. The regulations imposed by the grower in this case were by no stretch of the imagination narrowly tailored to protect legitimate property interests.[4] Each of the purported justifications posited by Andrews is without substance.

Andrews first asserts that its refusal to permit visitors inside the camp was justified to protect camp residents' right to privacy. First, the residents of the camp, not the owner, possess the right to privacy and the standing to assert it. The Court of Appeal in this case properly held that "[t]he employer's efforts to protect other worker's privacy rights may not be used as justification for denying access." (See also *Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d 654, 672-673; *Vista Verde Farms* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 307, 317; *Sam Andrews' Sons* v. *Agricultural Labor Relations Bd.* (1984) 162 Cal.App.3d 923, 927 [208 Cal.Rptr. 812]; *Merzoian, supra,* 3 ALRB No. 62, at p. 4.) There is no indication in the record that visitors—union or otherwise—had invaded the privacy of camp residents, or that residents had invoked their privacy rights.

Moreover, even if there had been conflict between residents who wished to communicate with the union and those who did not, the restrictions at issue were not narrowly tailored to accommodate the countervailing interests. The rights of those who do not wish to communicate with the union do

---

[4] Under Andrews's policy, no visitors were permitted to enter the camp without the permission of the 24-hour guard. Visitors were required to name the resident to whom they wished to speak. The guard would then inform the identified resident, who would be permitted to speak to the visitor only outside the camp. On November 10, 1981, Andrews's security guards forcibly ejected a union organizer from inside one of the barracks. Thereafter, guards began to demand identification from visitors suspected of being affiliated with the union and no longer recognized union identity cards as "proper" identification required before the guards would summon a worker to the gate.

not automatically conflict with, nor outweigh the rights of those who wish to receive visitors. The goal is to reasonably accommodate the various interests, not to obliterate the interests of some residents in the name of protecting the interests of others. The Board has instructed that "a heavy burden will lie with the owner or operator of a camp to show that any rule restricting access does not also restrict the rights of the tenant to be visited or have visitors." (*Merzoian, supra,* 3 ALRB No. 62, at p. 4.) Andrews's paternalistic motives, even if they were genuine, could not justify a complete ban on visitation in the labor camp.

Andrews's remaining justification for the access denials was that it sought, during a strike, to protect camp residents from union violence and to minimize discord between striking and nonstriking employees residing at the camp. The flaw in this reasoning is that the only residents of the Lakeview Camp during November 1981 were lettuce harvesters, and there was no strike during the lettuce harvest. The July 1981 strike against Andrews involved only tractor drivers, irrigators and melon harvesters. Although nonstriking tractor drivers had once been housed at the camp, they had been gone for three months before the November access denials. Some picketing continued through November, but only in the fields and at the office, not at the camp. Furthermore, the record indicates that no violence occurred in the Lakeview Camp during the month of November 1981 and no property inside the camp was ever damaged. The disturbances to which the majority refer occurred in August 1981 over a period of few days and promptly subsided when a restraining order was issued granting work site access to union representatives. Theoretically, carefully tailored restrictions on access could be justified to protect property and residents from the violent activity of outsiders. However, neither the property nor the residents were threatened in this case, and restrictions on that basis were therefore unjustified.

Finally, Andrews has not met its burden of establishing that effective alternative channels of communication were available. The company-owned park adjacent to the camp provides no shelter of any kind, so that visitors would be forced to meet with residents outdoors with no protection from cold, wind, rain or darkness. Moreover, the identification procedure imposed by Andrews added an additional chilling effect. The right of a resident to communicate with union representatives was dependent upon: (1) the representative knowing the resident's name; (2) the willingness of the security guard (an Andrews agent) to notify the worker of the representative's desire to speak with the resident; and (3) the willingness of both the representative and the resident to take the risk of subjecting the resident to the type of antiunion retaliation for which Andrews was notorious. (See

*Sam Andrews' Sons* (Dec. 3, 1979) 5 ALRB No. 68; *Sam Andrews' Sons* (Sept. 3, 1980) 6 ALRB No. 44; *Sam Andrews' Sons* (Oct. 5, 1982) 8 ALRB No. 69.) The supposed alternative channels of communication provided by Andrews were better designed to discourage communication with the union than to facilitate it.

The majority concede in a footnote that the "grower's visitation policies in the instant case were rather clearly not reasonable," but they do not explain the basis of this holding. Indeed, the only access restriction that they analyze in any detail is a fictional one which they create as a backdrop for discussion of issues not presented by this case. In the section entitled "Restrictions on Access 'in the Home,'" the majority first clarify that the workers' "home" to which access rights attach is the entire camp, not the communal bunkhouse. However, neither the grower nor the parties attempts to raise such a distinction. Visitors were not denied access to the bunkhouse specifically, but to the entire camp. The majority then caution against infringing on the "rights, both statutory and constitutional, of employees residing in the communal bedroom not to suffer visits by unrestricted numbers of union representatives at any and all hours of the day and night." Of course, there is no indication in this case that union representatives sought any such unreasonable access—either in terms of numbers or time. Finally, the majority suggest that permitting residents to invite visitors into the bunkhouse would "inevitably" impinge on the rights of other residents. In order to resolve this fictional dispute, the majority suggest that a policy excluding visitors from the bunkhouse would be appropriate. Hence, the majority create an issue from whole cloth and then resolve it to their liking. Although the entire section can only be regarded as dictum without any precedential value, I strongly object to the majority's gratuitous resolution of issues not before it.

## CONCLUSION

I sympathize with the Board's efforts to frame an effective order facilitating union access to Andrews's labor camp. Andrews had consistently exhibited its hostility to the union and its disrespect for the law. However, I agree with the majority that the Board has no authority to sanction the grower by depriving it of the right to impose reasonable restrictions on access which are narrowly tailored to advance legitimate property interests. Thus, to the extent the Board's order can be read as requiring unlimited access, it is overbroad. A better approach would have been to acknowledge the right of the grower to impose reasonable restrictions, but to emphasize the limited range of interests which could support restrictions on access to labor camps

and to caution against invoking improper justifications as a pretext for thwarting union activities.

Mosk, J., concurred.